**GILA RIVER PIMA–MARICOPA INDIAN COMMUNITY, et al.**

v.

**The UNITED STATES.  (Two cases).**

**Nos. 236 F, 236 I.**

United States  Claims  Court.

Feb. 27, 1986.

Z. Simpson Cox, Phoenix, Ariz., for plaintiffs.  Cox and Cox, Ira I. Schneier, and Sandra L. Massetto, of counsel.

George R. Hyde, Washington, D.C., with whom was Acting Asst. Atty. Gen. Anthony C. Liotta (No. 236 F), and Acting Asst. Atty. Gen. James W. Moorman (No. 236 I), for defendant.

## OPINION

HARKINS, Judge:

Plaintiffs' claims in these dockets originally were filed in the Indian Claims Commission on August 14, 1951, as cause of action IV in Docket 236. On June 12, 1968, amended petitions in Docket 236 were filed, pursuant to order of the Commission, so that the 14 original causes of action were separated into Dockets 236 A through 236 N. The Commission disposed of Dockets 236 A, B, E, G, H, J, K, L, and M, and awards totaling more than $7,753,081.96 were made to plaintiffs on claims in Dockets 236 A, B, and E.

On November 22, 1972, Dockets 236 F and 236 I were consolidated for the limited purpose of trial on liability issues. Trial was held in Phoenix, Arizona, on December 12–14, 1972, and the Commission's order closing proof was entered on January 10, 1973. During termination of the Commission's activities, these dockets were transferred on May 8, 1978, to the United States Court of Claims.[1] In that court, a schedule was established on March 2, 1979, for examination of transferred exhibits and for post trial briefs and requested findings of fact. On plaintiffs' motion, additional exhibits were admitted in evidence and proof was closed on April 3, 1979. Briefing for Docket 236 I was completed on December 7, 1981, and for Docket 236 F on March 9, 1982. On October 1, 1982, the dockets were transferred to the United States Claims Court pursuant to section 403(d) of the Federal Courts Improvement Act of 1982.[2]

In these dockets, plaintiffs claim that defendant undertook certain fiduciary duties and breached those duties in violation of standards applicable to trustees of Indian reservation lands and of the fair and honorable dealings clause of the Indian Claims Commission Act.[3] In Docket 236 F, plaintiffs claim that the United States in violation of its trust responsibilities refused to aid, and in fact prevented, the development of underground water for irrigation of areas of the reservation suitable for agriculture by pumped water. Plaintiffs also claim that the United States permitted lessees of reservation land to install pumps adjacent to the reservation and to use percolating waters from the reservation to plaintiffs' damage. In Docket 236 I, plaintiffs claim that the United States undertook to lease land on the reservation and, in violation of its trust responsibilities, failed to protect plaintiffs in the execution of leases of reservation lands, failed to properly administer and to supervise said leases, failed to obtain the fair market rental value of leased agricultural land, and failed to enforce the provisions of said leases.

## FACTS

The Gila River Indian Community (GRIC), formerly the Gila River Pima Maricopa Indian Community, is an identifiable group of American Indians recognized by the Secretary of the Interior. It has capacity under section 2 of the Indian Claims Commission Act of 1946 to maintain this action for the Pima and Maricopa tribes.

The Pimas and Maricopas, long before the appearance of Europeans, had maintained a riverine culture, along the Salt and Gila Rivers in Arizona, that included complicated irrigation techniques. They successfully cultivated extensive fields along the rivers. Over the years, in this and other dockets, general background information and detailed findings of fact about the Pimas and Maricopas and about the Gila River Indian Reservation, have been adjudicated by the Commission and in the courts.[4] That information is not repeated

---

1. Pursuant to the Indian Claims Commission Act of 1946, § 23; 25 U.S.C. § 70v (1976).

2. 28 U.S.C. § 171 note (1982).

3. 25 U.S.C. § 70a(5) (1976) gave the Commission jurisdiction of "claims based upon fair and honorable dealings that are not recognized by

any existing rule of law or equity." This jurisdiction has been transferred to this court and the standards established for its application apply to claims in these dockets.

4. *See:*
*Gila River Pima-Maricopa Indian Community, v. United States,* 24 Ind.Cl.Comm. 301 (1970); 27

here. The facts dealt with in this opinion, on the claims in Dockets 236 F and I, are concerned with: (1) the particular facts that apply to defendant's program to lease reservation lands that were not under the San Carlos Irrigation Project (SCIP or San Carlos Project), and, (2) defendant's actions in administering the reservation that affected the use of the underground waters of the reservation.

After the reservation was created in 1859, white settlers upstream began to divert water from the Gila River and in time the Indians were deprived of water needed for irrigation. In 1904, to protect plaintiffs' interests, the United States implemented several irrigation projects which had as a primary purpose restoration of sufficient water to enable the Indians at least to irrigate the same number of acres as they farmed prior to the upstream diversions.[5] The San Tan Flood Canal was the first of these efforts. It was to provide enough water, commencing in 1905, to irrigate 10,000 acres of reservation land north of the Gila River in the eastern part of the reservation. The site was chosen because a canal plaintiffs already were using, the San Tan Indian Canal, was immediately available. The project involved nine wells, which were drilled between April 20, 1908, and January 15, 1909, along a line located from ½ to 1 mile north of the San Tan

Indian Canal, and the construction of a flood canal further north.

The next project implemented by defendant was the San Carlos Project, a major effort that began in 1915. It comprised 100,546 acres of land along the Gila River and on the flood plain in the vicinity of Florence, Coolidge and Casa Grande, Arizona. The project consisted of two diversion dams, one at Florence, above the reservation, one at Sacaton, on the reservation, and a large storage dam at San Carlos. The SCIP incorporated both Indian lands and non-Indian lands, and included the area involved in the San Tan project.

The San Carlos Project boundaries extended from the eastern edge of the reservation, irregularly, to about its center; the western and northwestern areas of the reservation, and small areas along the northern and southern boundaries, were excluded. In total, the project was to provide enough water to irrigate 50,546 acres of Indian land and 50,000 of non-Indian land. Less water was available in the Gila River watershed than originally estimated. As a result, since 1929, when water first was delivered, the San Carlos Project has been able to irrigate only an average of 21,000 acres of reservation land.[6]

The main source for the SCIP water supply was the surface run-off from the Gila River watershed upstream from the

Ind.Cl.Comm. 11 (1972); 494 F.2d 1386, 204 Ct.Cl. 137 *cert. denied*, 419 U.S. 1021, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974); 2 Cl.Ct. 12 (1982) (Docket 228).
*Gila River Pima-Maricopa Indian Community v. United States*, 29 Ind.Cl.Comm. 144 (1972); 684 F.2d 852, 231 Ct.Cl. 193 (1982) (Docket 236 C).
*Gila River Pima-Maricopa Indian Community v. United States*, 695 F.2d 559 (Fed.Cir.1982) (Docket 236 D).
*Gila River Pima-Maricopa Indian Community v. United States*, 33 Ind.Cl.Comm. 18 (1974); 38 Ind.Cl.Comm. 1 (1976); 586 F.2d 209, 218 Ct.Cl. 74 (1978) (Docket 236 E).
*Gila River Pima-Maricopa Indian Community v. United States*, 20 Ind.Cl.Comm. 136(2) (1968); 427 F.2d 1194, 190 Ct.Cl. 790 *cert. denied*, 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970) (Dockets 236 K, L and M).

**5.** The issue of upstream diversions and the duty of the United States to protect plaintiffs from

loss of their water was litigated in Docket 236 C. In that case, it was determined that the United States, after 1905, through its irrigation projects, did all that it was required to do to protect the water that plaintiffs could put to beneficial use. *Gila River Pima-Maricopa Indian Community v. United States*, 684 F.2d 852, 231 Ct.Cl. 193 (Ct.Cl. 1982).

**6.** See *Gila River Pima-Maricopa Indian Community*, 684 F.2d at 860. The picture of the San Carlos Project that emerged from evidence before it caused the Commission to characterize the project as "an engineering white elephant, which at exorbitant cost only partially restores the water the plaintiffs were utilizing gratis over a century ago." *Gila River Pima-Maricopa Indian Community v. United States*, Docket 236 E, 38 Ind.Cl.Comm. 1, 4 (1976), *rev'd in part*, 586 F.2d 209, 218 Ct.Cl. 74 (1978).

project. As originally planned, 80 percent was to come from surface water and 20 percent was to come from pumping. Over 100 irrigation wells were drilled on SCIP lands to obtain water from the underground supply, and, as of 1943, electrically driven turbine pumps operated 86 wells. Less surface water from the Gila River watershed resulted in an increase in the amount of pumped ground water. In 1943, of all the water used for irrigation in the SCIP, ⅓ was pumped from underground sources.

Plaintiffs' claims in these dockets are concerned with irrigation of reservation lands that were not under the SCIP. During the relevant period, water to irrigate reservation lands that were outside SCIP lands could be obtained from the following sources: (1) drainage water from private lands north of the reservation brought to the reservation in the Tempe Drain, (2) purchases from private irrigation districts using the Tempe Drain, and (3) ground water pumped from wells.

GROUND WATER

Availability of substantial amounts of ground water for irrigation purposes on the reservation was confirmed as early as 1904.[7] Extraction of underground water, however, was expensive. Historically, the Indians had not utilized pumped water in their irrigation, and, after the reservation was established, could not without assistance drill wells and pump water. The 1904 survey concluded that water supplied to reservation lands by pumping could make the Indians moderately prosperous. In 1903 and 1904, experimental wells were installed in the area around Sacaton to provide pumped water for irrigation. In this program, defendant drilled and equipped five wells on the reservation.

TEMPE DRAINAGE DITCH

Prior to 1917, farm lands of the Tempe Irrigation District, which served private lands in the Salt River east of Tempe and south to the Gila River reservation, became waterlogged. To save these lands for cultivation, the Tempe Drainage District was organized to provide a method to drain the waterlogged private lands. The Tempe Drainage Ditch was constructed. It headed in the area east of Tempe and ended at the reservation boundary. It dumped the water on reservation lands in the NW/4 of Sec. 4, T.2 S, R.4 E. Eventually, although the reservation received some beneficial water, a lake and swamp was formed in parts of Sections 9, 14 and 15, of T.2 S, R.3 E.

In order to correct the reservation's drainage problem, a contract with the Tempe Drainage District, dated January 20, 1917, and approved December 7, 1917, by the Secretary of the Interior, granted a right-of-way to the district across the reservation lands and permitted the district to construct the Tempe Drain extension to the Gila River. In return, the district granted the Indians a right to use the natural flow of tail water collected in the Tempe Drain to irrigate reservation lands.

The rights and obligations of the Tempe Drainage District were assumed by the Salt River Valley Water Users Association (SRVWUA) when it took over the lands of the drainage district. A contract dated January 21, 1923, approved July 23, 1923, provided for the construction by the SRVWUA of a drainage ditch extending from the end of the old Tempe Drain across the reservation to the Gila River. This contract continued the right-of-way grant, and continued the right of the Indians to tail water in the Tempe Drainage Ditch to irrigate reservation lands.

BUCKEYE–ARLINGTON AGREEMENT

In September 1929, the Buckeye Irrigation Company and the Arlington Canal Company, as coplaintiffs, brought suit in Superior Court, Maricopa County, Arizona, against the SRVWUA, the San Carlos Irrigation and Drainage District, the San Carlos project engineer, the Gila River Indian

---

**7.** U.S. Geological Survey Water Supply Irrigation Paper No. 104, "The Underground Water of    Gila Valley, Arizona." 1904.

Reservation superintendent, and individual reservation Indians. The suit claimed that the construction of the Coolidge Dam and Reservoir by the United States, and construction of reservoirs and irrigation structures in the Salt River, together with large scale pumping, had interfered with and diminished plaintiffs' water supply. Both companies represented users who diverted water from the Gila River below the mouth of the Salt River. The United States appeared specially, and challenged the court's jurisdiction. Proceedings in court languished and ultimately the Secretary of the Interior appointed a mediator. Mediation proceedings extended over several years.

In 1938, negotiations for a settlement in the Buckeye-Arlington case became involved in and had an impact on the program to lease reservation land outside the San Carlos Project. In a letter dated July 14, 1938, the chief field counsel, Indian Field Service, advised the Director of Irrigation that a proposed lease to develop reservation land should not include sinking wells on the reservation because it could jeopardize a settlement with the Buckeye and Arlington Companies.

The chief field counsel pointed out that the Buckeye suit had been pending for a long time, that it had a nuisance value which could be made to cost the San Carlos Project a great deal of money before it could rid itself of the suit, and that negotiations were underway for an agreement so as to allow the San Carlos Project a free hand in the use of the water of the Gila River and its tributaries above Gila Crossing. Indians who owned the land which would be included in the proposed development lease would receive benefits from a settlement that "would outweigh the possible benefits which they could receive from this further development."

The chief field counsel continued, if the proposed lease were made, "the Buckeye people would charge that the new development constitutes an additional infringement upon their old rights and a settlement of the suit would be jeopardized...." In the event there was no settlement, it would furnish the Buckeye people "additional ammunition with which to force the Government to participate in litigation which would involve the ultimate determination of the respective water rights in the Gila and Salt Rivers."

The Buckeye Irrigation Company submitted a settlement proposal to the Secretary of the Interior on November 5, 1938. It was accepted on February 17, 1941. The agreement did not become final, however, until May 19, 1947, after funds for the settlement had been appropriated.[8] The United States, on behalf of the San Carlos Project and the Indians, in two identical settlement agreements, paid $104,000 to the Buckeye Irrigation Company and $10,000 to the Arlington Canal Company. In return, the companies released the United States, the San Carlos Irrigation and Drainage District, and the Pima Indians: (1) from all damages or claims of damage by reason of past, present or future operation and use of the Coolidge Dam and the storage of Gila River water in the San Carlos Reservoir; (2) for the past, present or future diversions of water at Ashurst-Hayden and Sacaton Diversion Dams, also on account of the construction of any new storage and/or diversion dams on the Gila or its tributaries above the Sacaton Bridge and Diversion Dam and/or the storage of water therein or diversions therefrom; and, (3) for past, present or future diversions at Gila Crossing for the irrigation of 2,992.5 acres of Indian lands. This release was subject to the proviso that the construction of new reservoirs or other storage works that may be built by the United States or its assigns to store and divert additional quantities of Gila River waters together with existing reservoirs and other works "shall not be used for the purpose of irrigating more than 100,346 acres of San Carlos Irrigation Project lands plus 1545 acres of Florence-Casa Grande Project lands not in the San Carlos Project and said 2992.5 acres of non-project Indian lands under the Gila Crossing irrigation system."

---

8. Department of the Interior Appropriations Act, Pub.L. No. 123, 59 Stat. 318, 320 (1945).

Subject to that limitation, the settlement provided that the United States could build "for the San Carlos Irrigation Project such other storage and diversion dams" as it may choose upstream on the Gila River or its tributaries.

Subject to the same limitation, the United States could drill such new wells and install pumps therein as it may deem necessary to more fully utilize water rights enumerated in the agreement. These enumerated rights of the United States to use Gila River water for irrigation in the San Carlos Project were: (1) direct diversion rights, the earliest of which had an immemorial date of priority; (2) storage rights with a priority of not later than June 4, 1924; and (3) "underground rights including the right to pump from the subsurface flow of the Gila River at any and all points between the San Carlos Project Ashurst-Hayden Diversion Dam and the western boundary of the said San Carlos Irrigation Project."

The settlement also released the United States and the Pima Indians from all damages or claims of damage by reason of past, present or future irrigation of the "Lone Butte" farm, the "Broadacres Ranch", the "Collier" lease farm and the "Cheatham" lease farm. The plaintiffs also agreed the settlement shall be construed as including the consent of the plaintiffs for the Indians of the Gila Reservation, or the United States for them, to continue the irrigation of those farms with water obtained from the Tempe Drain, from wells or "by the drilling of new wells from time to time for the purpose of obtaining an adequate water supply to irrigate all or any of said four farm areas."

GROUND WATER CONDITIONS

Reservation ground water is in a reservoir in the Central Arizona Basin, which is approximately 100 miles in length with an average width of about 50 miles. The Sacaton area of the Gila River Indian Reservation is "situated in the very heart" of the Central Arizona Basin.[9]

In 1904, prior to significant ground water development, a Geological Survey report stated the depth to water generally was less than 50 feet in wells in the area from Coolidge to the mouth of the Gila River. Near Florence, the depth to water in wells ranged from 48 to 74 feet below the land surface; near Casa Grande the depth to water ranged from 42 to 49 feet below the land surface. In the area along the Gila River downstream from the railroad crossing north of Maricopa, ground water was close to the surface.

Ground water appeared at the land surface at a point on the Gila River about 10 miles upstream from Sacaton in sec. 30, T.4 S., R.8 E. Along the banks of the Gila River near this site, water was above the bed of the river and was at depths of 1 to 11 feet below the land surface in a ditch dug to collect seepage water for irrigation. Downstream from Sacaton, the water level was very shallow because in this reach the Gila River was, at times, a gaining stream.

Sufficient data are available only after 1923 to determine water level changes. Since the beginning of ground water development, water levels along the area of the Gila River encompassed in the reservation and the San Carlos Project have declined. It is probable that the 1923 water levels were higher than the water levels prior to disturbance by irrigation of the hydrologic system. Early surface-water irrigation caused a rise in water levels. When ground water began to be pumped for supplemental irrigation, water levels started to decline, which resulted in a decrease in the base flow to the Gila River. .

Between 1923 and 1942, there was practically no change in the depth to ground water levels on the reservation. Between 1942 and 1947, pumping of ground water from wells on the reservation was substantially increased, primarily from reservation SCIP lands.

9. Thiela, *Groundwater Hydrological Survey in the Sacaton Region of the Gila River Indian*    *Reservation,* July 1954, at 2.

From 1923 to 1947, water level declines were less than 50 feet in the Gila River Indian Reservation and in most of the adjacent area. Near Eloy, early development of ground water caused water level declines of 50 to 100 feet from 1923 to 1947.

From 1923 to 1964, in the part of the San Carlos Project exclusive of the Indian reservation, water levels generally declined from 50 to 150 feet, and in the part of the Indian reservation within the project, water levels generally declined from 50 to 100 feet. In the leased lands on the reservation northwest of the San Carlos Project, water levels generally declined from 50 to 150 feet. In the northwest corner of the reservation, water levels generally declined less than 50 feet. In the highly developed parts of the lower Santa Cruz Basin south of the reservation, in the Stamfield-Maricopa and Eloy areas, water levels from 1923 to 1964 declined as much as 300 feet.

Ground water mining of the Central Arizona Basin is extensive. The amount of ground water pumped in the central Arizona area increased from 450,000 acre-feet in 1923 to 3,700,000 acre-feet in 1953. In 1964, the amount of ground water pumped decreased to 3,200,000 acre-feet.

The total volume of water pumped from the ground water reservoir from 1923 to 1964 was 80 million acre-feet, which constitutes a serious overdraft from the aquifer system. The overdraft is causing water levels to decline as much as 20 feet per year in places. Between 1923 and 1964, the total volume of ground water "mined" from beneath the reservation was about 3,700,000 acre-feet. As a result, ground water levels declined an average of 64 feet. Off reservation pumping by lessees of reservation land took ground water from under the reservation.

LEASING PROGRAM

Leases to non-Indians to develop arable reservation land outside the San Carlos Project apparently were first made in 1918. Evidence in the record supports the conclusion that at least 27 leases were entered during the period 1918 through 1951.[10] The land involved in these leases primarily was located in Townships 1 and 2 S, Ranges 2, 3 and 4 E, in the north center areas of the reservation. The court has jurisdiction of plaintiffs' claims arising from these leases.

The leasing program divides into two periods: (1) 1918–46, which was based on the availability of irrigation water from the Tempe Drain and from the SRVWUA; and (2) 1946–51, which was based on a program that included a requirement that the lessees obtain irrigation water from sources off the reservation.

Leases for the areas that had been leased in the pre-1946 period, when renewed in the 1946–51 period, were adjusted to comply with the 1946 program. These areas include:

1. Broadacres Ranch

| Date | Lessee | Term | Acres |
|---|---|---|---|
| Feb. 15, 1918 | Lincoln Fowler | Feb. 15, 1918–Feb. 15, 1926 | 2,600* |
| Aug. 1, 1926 | W.A. Thompson, G.J. Hammons, L.C. Main | Aug. 1, 1926–July 31, 1936 | 2,500. |
| Feb. 1, 1936 | San Carlos Farms Company | Feb. 1, 1936–Jan. 31, 1946 | 1,200 |

10. Evidence in the record concerning leases involved in this case is incomplete and fragmentary. The first lease on Broadacres Ranch apparently consisted of separate leases with each allottee; only one lease, for 10 acres, between Lincoln Fowler and Fred Thommassa, is in evidence. One of defendant's exhibits, Report by Joseph L. Diddock, shows the Fowler lease as extending from 1916–26. Copies of all leases are not included, and information about the leases must be gleaned from fragments of documents, and from references in correspondence and internal memoranda that were prepared long after the relevant time. Lease dates not available from contract documents are derived from advertisements and bid opening dates.

| Date | Lessee | Term | Acres |
|---|---|---|---|
| Oct. 20, 1942 | William Damman | Feb. 1, 1943–<br>Jan. 31, 1946 | 1,164.22 |
| Jan. 7, 1946 | William Damman | Feb. 1, 1945–<br>Jan. 31, 1951 | 1,565 |
| Jan. 25, 1951 | Gail Taylor | Feb. 1, 1951–<br>Jan. 31, 1961 | 1,705 |

*Plaintiffs' estimate.

2. Lone Butte Farms Tract

| Date | Lessee | Term | Acres |
|---|---|---|---|
| Dec. 22, 1928 | Lone Butte<br>Farms Company | Feb. 1, 1929–<br>Jan. 31, 1939 | 1,840 |
| Sept. 1, 1930 | Lone Butte<br>Farms Company | Mar. 1, 1930–<br>Jan. 31, 1939 | 200 |
| Feb. 1, 1939 | Lone Butte<br>Farms Company | Feb. 1, 1939 *–<br>Jan. 31, 1943 | 1,969.87 |
| Jan. 10, 1943 | Franklin B. Cox | Feb. 1, 1943–<br>Jan. 31, 1948 | 1,989.62 |
| Sept. 8, 1947 | Franklin B. Cox | Feb. 1, 1948–<br>Jan. 31, 1953 | 1,989.62 |

* From Jan. 31, 1940–Jan. 31, 1943, lease was valid for 1 year periods.

3. Collier Tract

| Date | Lessee | Term | Acres |
|---|---|---|---|
| May 6, 1941 | I.F. Collier | Oct. 1, 1941–<br>Sept. 30, 1946 | 486.02 |
| Mar. 25, 1946 | I.F. Collier<br>W.R. Collier | Oct. 1, 1946–<br>Sept. 30, 1956 | 1,656.84 |

In addition to the post-1946 leases on Broadacres Ranch, Lone Butte Farms tract and Collier tract, the 1946–51 period included the following leases:

| Date | Lessee | Term | Acres |
|---|---|---|---|
| Feb. 20, 1946 | A.E. Price | Aug. 1, 1946–<br>July 31, 1956 | 252.29 |
| Feb. 20, 1946 | W.H. Johnson | Aug. 1, 1946–<br>July 31, 1956 | 297.66 |
| Oct. 26, 1946 | A.E. Price | Jan. 1, 1947–<br>Dec. 31, 1956 | 440.50 |
| Oct. 28, 1946 | Bogle Farms, Inc. | Jan. 1, 1947–<br>Dec. 31, 1956 | 758.34 |
| Mar. 19, 1947 | R.W. Hanna | July 1, 1947–<br>June 30, 1957 | 611.47 |
| May 1, 1947 | R.W. Hanna | July 1, 1947–<br>June 30, 1957 | 544.34 |
| June 25, 1947 | R.S. Ward | July 1, 1947–<br>June 30, 1957 | 50 |
| Dec. 17, 1947 | C.M. Colvin<br>S.J. Wilden | Feb. 1, 1948–<br>Jan. 31, 1958 | 336.11 |
| Dec. 17, 1947 | M.B. Kubelsky<br>C.O. Pitrat | Feb. 1, 1948–<br>Jan. 31, 1958 | 519.36 |
| Feb. 11, 1948 | E.C. Cheatham<br>C.M. Colvin | Mar. 1, 1948–<br>Feb. 28, 1958 | 536.73 |
| June 10, 1948 | E.C. Cheatham<br>L.F. Cheatham | Mar. 1, 1949–<br>Feb. 28, 1959 | 540.2461 |

| Date | Lessee | Term | Acres |
|------|--------|------|-------|
| Nov. 25, 1948 | M.B. Kubelsky C.O. Pitrat | Feb. 1, 1949– Jan. 31, 1958 | 274.13 |
| Mar. 2, 1948 | C.M. Colvin | Feb. 1, 1949– Jan. 31, 1958 | 451.04 |
| June 10, 1949 | S.J. Wilden | Jan. 1, 1949– Dec. 31, 1957 | 160 |

Plaintiffs divide defendant's management of the leasing program into three periods: (1) 1918–40; (2) 1941–58; and (3) 1957–present. Plaintiffs have introduced into evidence leases entered in the 1957–present period, and have identified nine of these leases in support of their claim of violation of trust responsibilities.

The 1957–present leases were not part of a leasing program that was started before August 13, 1946. In 1957, a new leasing program was started, the major component of which was to allow lessees to drill wells on the reservation lands for irrigation purposes, or to require the lessee to deed to the United States ownership of wells the lessee had drilled on land adjacent to the reservation. The 1957–58 program was directly opposite of the program approved in 1946 relative to the requirement that irrigation water be obtained from off-reservation sources. This court does not have jurisdiction under the Indian Claims Commission Act to address claims arising from those leases.

Most of the land on the reservation available for irrigation development leases was owned by individual Indian allottees. Each member of the Tribe, under federal programs, had received a 10-acre primary allotment of irrigable land, and a secondary allotment of 10 acres of desert land. There were 97,605 10-acre allotments. Land that was not allotted was tribal land, owned by the GRIC as a whole.

Before a lease could be executed, at least a substantial majority of the owners of the land to be leased had to consent in writing. In some leases, this required as many as 70 signatures from individual Indians. Tribal lands could not be leased to non-members; they were available for lease only under a revocable permit. The area of tribal lands suitable for irrigation was small in comparison to allotted lands, but when any tribal land was present the lessee, or the Pima Agency, had to request the GRIC council to pass a resolution that granted the lessee a revocable permit.

Leasing was subject to statutory limitations, and to extensive controls in Department regulations. After 1916, irrigable lands could be leased for agricultural purposes only for a maximum period of 10 years. In 1935, legislation was enacted that permitted longer terms for specific uses when necessary to develop the land.[11] The Department regulations in effect during the relevant period were comprehensive and detailed. Among other items, they specified the form and term of leases, provided procedures for approval of the agency superintendent, approval of leases over objections of minority interests, and for appraisement, advertising and letting. Rental values of land to be leased through the agency had to be competently appraised, and the rental could not be less than the appraisal. After advertising, offers could be made by sealed bids or at public auction. Prior lessees, or contiguous land owners, were provided a preference to meet a high bid. The Commissioner of Indian Affairs, in an appropriate case, could waive advertising on request from the agency superintendent.[12]

The leases made in the 1918–1951 period for the most part were the product of ad-

11. Act of May 18, 1916, 25 U.S.C. § 394 (1982); Act of Aug. 9, 1955, 25 U.S.C. § 415 (1982).

12. *See* 25 C.F.R. §§ 171.1–171.36 (1938 Ed.).

vertising. Four may not have been advertised: Fowler, 1918–26; Lone Butte Farms, 1929–39; Collier, 1946–56; and Cheatham and Colvin, 1948–58. The circumstances surrounding these leases were such that waivers of the advertising requirement were requested or justified.

All leases in the 1918–51 period were under the affirmative control and responsibility of the superintendent of the Pima Agency. That official initiated, negotiated, implemented and supervised the leases. Although the GRIC was required to approve any development of tribal land, and individual allottees had to approve of leasing of their own land, these actions were administrative impediments that did not alter the superintendent's role. Availability of any land suitable for lease was advertised by the Pima Agency and the advertisements listed requirements and conditions promulgated by the superintendent that were to apply to the leases. Lease agreements sometimes were signed by the agency superintendent, or his delegate, as lessor on behalf of the Indians. Some leases required the rental payment to be made to the superintendent, who would accept it on behalf of the Indians. The superintendent, or the agency engineer, supervised the location of any wells, and construction of irrigation canals and gates were controlled by agency specifications. All leases were made through application of departmental regulations.

All of the leases in the 1918–51 period provided for the development of unimproved reservation land. A development lease obligates the lessee to take unimproved reservation land and subjugate it for irrigated agriculture. In subjugating land, it must be cleared, leveled and bordered, and irrigated by means of appropriate dikes, channels, ditches, and control structures. A source of water must be provided. These improvements require substantial capital investments. The value of the lease to the lessor is the combination of cash rentals paid and the improvements installed.

When leases are negotiated at the beginning of a development program, land values are based upon unimproved and unwatered land. In the early years, the lessee has substantial expenditures and unproductive land. After the land is subjugated, operating costs and maintenance expenses are continuing factors. In the event the water supply is insufficient, leases on acreage that has been subjugated are unlikely to be renewed, the tract may be abandoned, the fences removed and the area allowed to revert to desert land. On the Broadacres tract, approximately 1,450 acres were abandoned after the first lease.

Throughout the 1918–51 period, the leases were made on government forms. Over time, development obligations came to be specified in elaborate detail. The Broadacres Ranch Fowler lease, 1918–26, for example, contained a 4-page statement that included all special undertakings. The development obligations were:

That the exterior boundaries of tracts leased under this Contract shall be fenced within one year after date of leases and there shall be a north and south road fenced through tract on alternate section lines. During the last year of the leases there shall be constructed fences dividing separately the allotments of each family of Indians and open roads on section and one half sections lines running north and south width of roads to be forty feet or twenty feet on each side of line. . . .

That the [lessee] shall have the right of way for a canal and shall construct laterals north and south across the lands leased under this contract at a distance of one quarter of a mile apart east and west. Said laterals to be completed not later than the last year of said leases and in such manner as to deliver water to each ten acres allotment. All structures, gates and turnouts shall be constructed of concrete. . . .

That the [lessee] shall clear all the land covered by lease under this contract and construct borders thirty five feet to irrigate at least eighty five per cent of each allotment. The land shall be deemed lev-

el and properly bordered when it is level transversely between borders.

The Broadacres Ranch Taylor lease, 1951–61, contained a 5-page statement of improvement obligations, with item captions that included: Irrigation Improvements, Fences, Road, Drainage, Maintenance and Management. The Explanatory Statement provided:

*Improvements* belonging to the lands under this lease include boundary fences and cross fences, one domestic well, and irrigation system consisting of three irrigation wells (located on reservation land outside the leased area), main canals and field service laterals, headgates and bridges. In addition, the lands under this lease receive drainage water from the Tempe Drainage Ditch derived from waste water from the Salt River Valley Water Users Project, and from wells operated by the Salt River Valley Water Users' project under an agreement with the lessee whereby the lessee pays for the pumped water.

Other development obligations in the Taylor lease included:

The lessee shall, at his own expense, enlarge the present main canal to fully and properly carry and discharge the irrigation water to the capacity of all irrigation water made available for the lands under the lease, and shall construct and maintain check gates and turn-out gates that are necessary to properly control the irrigation water.

MAINTENANCE: The lessee shall maintain fences, irrigation ditches, wells and well equipment, transmission lines, gas pipe lines, irrigation and drainage structures, bridges, and roads in good repair during the life of this lease, all of which shall be left in good repair and working order at the expiration of the lease.

Provision of a source of water is an essential element of a development lease. During the 1918–46 period, reservation lands that were leased were able to take advantage of the Indians' water rights in the Tempe Drain and lessees were given access to the Indians' water. In these leases, the right to use all water discharged from the Tempe Drain on to the Gila Reservation was provided "free of charge" for irrigating the lands covered. To supplement that source, the lessees, in some cases, were permitted to sink wells on reservation land. The lessees were notified that any supplemental water obtained from the SRVWUA would have to be purchased at lessees expense.

The Fowler lease, 1918–26, stated:

That the party of the second part shall have the use of all water discharged from the drainage of the Tempe Drainage District on the Gila River Reservation.... free of charge, for the use of irrigating lands covered by leases from Individual Indians ... for the period and duration of his leases, except that the quantity of said flow of water equal to four acre feet per acre shall be reserved to irrigate [other] lands ... amounting in all to 320 acres.

Tail water in the Tempe Drain was not sufficient to irrigate the 2,600 acres leased on the Broadacres Ranch. Approximately 1,450 acres of the west portion of the Fowler lease were abandoned due to a lack of water in the Tempe Drain. The shortage, initially, was caused by closing drainage wells after the SRVWUA consolidated with the Tempe Drainage District. Later, the shortage came from the general lowering of the water table. Fowler, and subsequent Broadacres Ranch lessees, supplemented the Tempe Drainage Ditch water with ground water from wells drilled on the reservation, and with water purchased under contract from the SRVWUA.

The advertisement for the second Broadacres lease, 1926–36, noted that water to irrigate the land during the Fowler leases was furnished by the SRVWUA at the rate of $4 per acre per annum and that the successful bidder "must arrange with the association therefore." Similarly, the advertisement for the Broadacres Ranch 1945–51 Damman lease noted:

*Water for the irrigation* of this land has been supplied in the past from a

large open drain ditch known as Tempe Drain, from which there is free drainage water privileges supplemented by three irrigation wells belonging to Broadacres Ranch, and from certain irrigation drainage wells under the Salt River Irrigation Project, both of which belong to the Salt River Valley Water Users' Association. The lessee must make his own arrangements for irrigation water, executing all necessary contracts and agreements for the same which will provide an adequate supply that is deemed satisfactory by the Superintendent of the Gila River Indian Reservation.

In the Lone Butte Farms lease, 1929–39, the lessee was obligated to contract with SRVWUA for water, other than the water available to the Indians under the Tempe Drain contract, and to secure for the United States an option on that water for 10 years at a price not to exceed $4 per acre per year. The lessee also was to construct a main canal from the Tempe Drain and permit Indian allottees east of the leased premises to secure from the main canal the additional water purchased from the SRVWUA, provided the Indian allottees paid in advance their proportional share of the water charges. The lease provided:

The Lessee further agrees that he will, within one year from the date of approval of this lease, secure a contract from the Salt River Valley Water Users' Association for sufficient water to irrigate the leased premises, which contract shall contain an agreement to give the United States Government an option on said supply of water for the irrigation of this tract of land for ten years additional after the expiration of this lease at not to exceed $4.00 per acre per year; provided, however, that if the lessee is unable to secure said contract from the Salt River Valley Water Users' Association he will, within one year from the date of approval of this lease, put down a sufficient number of wells and equip them with pumps adequate in number and capacity to irrigate said tract of land properly. The estimated value of this improvement is $30,000.

The Lessee further agrees that he will, at his own expense, within one year from the date of approval of this lease, construct a main canal of sufficient capacity to carry irrigation water from said wells or from some point on the Tempe Drainage Canal to the leased premises; that he will construct a complete distributing system of laterals, ditches, headgates, checks, drops, culverts and other structures that may be necessary for the irrigation of the land and control of the water; that he will construct bridges over the main canal and laterals where they cross section lines, if, in the opinion of the Superintendent of the Pima Agency, a roadway should be maintained; that he will construct a system of ditches to take care of and properly dispose of all waste water. The estimated value of this improvement is not to exceed $20,-000.

During the term of the San Carlos Farms lease, 1936–46, water in the Tempe Drain was being used by the lessee. In 1938, I.F. Collier sought a lease of reservation land located to the north and east of the San Carlos Farms leasehold area. I.F. Collier owned lands adjacent to the reservation in sections 31 and 32, Twp 1 S, R.4 E. This land was within the boundaries of the Salt River Project and was within the boundaries of the former Tempe Drainage District.

In July 1938, the Indian Field Service considered a request from I.F. Collier to lease about 1,800 acres of reservation land that was adjacent to his private outside land. Collier proposed to sink wells on the reservation and to use the water thus obtained to irrigate the reservation land.

Collier's land, and the reservation land he proposed to lease, were located northwest of the Tempe Drain. The water level on Collier's land was close to the surface of the ground and became flooded when the SRVWUA was not carrying out a full drainage program. Collier believed that if he leased the reservation land and sank

wells he would be able to drain his own lands at the same time.

The San Carlos Farms Company objected to permitting Collier to drill wells on the Indian lands because, it claimed, to permit such pumping would drain water which otherwise would come to the surface in the Tempe Drain. The tail water in the Tempe Drain was available to Broadacres Ranch under its lease, and San Carlos Farms contended that any condition that deprived it of the water would be a violation of its lease.

In a letter dated July 14, 1938, the chief field counsel of the Indian Service advised the Director of Irrigation that to permit the drilling of the proposed wells on the reservation would result in the new lessee using water that was appurtenant to the San Carlos Farms Company acreage. He stated:

If the drilling of the wells which have been proposed were accomplished and the drainage of Mr. Collier's lands resulted as is now contemplated, it is difficult to see how any other sound conclusion could be reached than that the new lessee would be using water which under the provisions of the Tempe Drainage District contract of 1917 became appurtenant to the 2,500 acres of land which embraced within its area the 1,250 acres which now constitute the San Carlos Farms Company lease.

The letter recommended that no lease be granted to I.F. Collier until the Buckeye-Arlington litigation was settled, or determined, and until scientific data could establish whether pumping water on the reservation at the location proposed would constitute a violation of the prior rights of the Indians in lands then under lease to San Carlos Farms Company.

On December 26, 1939, I.F. Collier again requested a lease. This time the request stated that he had finally made the necessary arrangements for electrical power and he was in a position to ask for 488.30 acres of reservation land adjacent his property. At this time, other applicants were seeking leases to other reservation lands. The Pima Agency deferred decision. On January 18, 1940, Mr. Collier was advised by the superintendent of the Pima Agency that:

This office has decided to withhold advertising any of the Reservation lands for improvement leases until the electrical power situation regarding the Parker power for this Reservation has been more definitely decided. We will continue the work of preparing the land ownership schedules in order that we may be in a position to advertise this land for lease on short notice. It is possible we will be in a position to advertise this land for lease soon after the 1st of July, the lease to start about November 1, 1940. This will allow the lessee time to prepare the land for cropping the first year.

The Pima Agency refrained from entering a lease with I.F. Collier until May 6, 1941. The Collier tract lease, 1941–46, required the lessee to obtain irrigation water off the reservation. The lease provided:

8. IT IS DEFINITELY UNDERSTOOD AND AGREED by and between the parties hereto that the Lessee at his own expense will for the period of this lease supply irrigation water for this land from irrigation well located on adjoining land belonging to the Lessee; and the Lessors and the United States Government acting through the Superintendent of the Pima Indian Agency hereby disclaim any right, title, or interest in the irrigation well or for the continued use of water from this well by reason of the temporary use of water from this well on Indian lands under this lease.

In 1945, when the Broadacres lease (Damman, 1943–46) and the Collier tract lease (1941–46) were considered for renewal, the Pima Agency also considered development of other tracts of land on the reservation outside the SCIP. On April 23, 1945, the Pima Agency superintendent requested advice from the Commissioner of Indian Affairs as to the development of additional land along the boundary of the reservation that was susceptible of being irrigated from wells or other sources outside the boundaries of the reservation. On

May 26, 1945, the Office of Indian Affairs approved renewal of the Broadacres Ranch tract, the Collier tract, and authorized leases on the West Goodyear boundary line tract. The letter authorized:

> You may proceed, with the consent of the Community Council and the allottees, to arrange for improvement leases of land alongside of the boundary of the reservation which is to be irrigated from sources outside of the reservation. You should obtain the advice of Assistant Director Southworth as to the feasibility of improving and irrigating lands of this kind.

With respect to the request to develop irrigation water from wells within the reservation boundary, the letter reaffirmed the position that decision should be deferred until the Buckeye-Arlington settlement was approved. The letter stated:

> You also recommend the development of additional irrigation from wells within the reservation boundary but outside of the San Carlos Project area if the Buckeye agreement would permit us to develop additional underground water. The Arlington-Buckeye agreement has not yet been approved. The attorney for the Arlington-Buckeye interests agreed with Associate Chief Counsel Flickinger, that the area outside of the project lands but within the reservation and now irrigated from wells and other sources within or without the reservation boundaries, total about 4,400 acres, should be added to the total area recognized in the agreement as being entitled to a water supply. Hence the Broadacres and Collier leases may be renewed on the basis of the present irrigated acreage only, unless water is imported from sources outside of the reservation.

Pursuant to this authority, the Pima Agency in 1946 entered four new leases, and renewed the Broadacres Ranch (Damman, 1945–51) and the Collier tract (1946–56) leases; in 1947, the Lone Butte Farms tract (Cox, 1948–53) lease was renewed and five new leases were entered; in 1948, four new areas were leased, and one in 1949. In 1951, the lease on Broadacres Ranch (Taylor, 1951–61) was entered under this authority.

The primary characteristic of all of these leases was that the lessee was required to obtain irrigation water from sources off the reservation. Wells were allowed to be drilled on-reservation for acres already under cultivation,[13] but off-reservation sources of water were required for new acreage to be developed. Each lease in the 1946–51 program attached an Exhibit A, which contained the following provision:

> 1. IRRIGATION WATER: It is understood and agreed by and between the parties hereto that the Lessee shall make his own arrangements for irrigation water, which shall be developed or furnished from sources outside the Gila River Indian Reservation, and which shall be at his own expense, executing all necessary contracts and agreements for the same.
>
> It is specifically understood the lessee makes no representations as to the amount of irrigation water to be furnished by the lessee for use on the within described premises, that the Lessor and the demised premises shall acquire no water or other rights to the use of such water from wells and all other sources outside the Gila River Reservation, and that all such rights are reserved to the Lessee.

In a development lease, the value to the lessor, and the rental provided by the lessee, consists of the combination of (1) cash rentals, (2) subjugation for irrigated agriculture (clearing, leveling, ditching, fencing and placing land under cultivation) and (3) maintenance of the irrigation system and other improvements. Cash rentals in the 1918–51 leases varied from no cash rent on the first Broadacres Ranch (Fowler, 1918–26) lease to $15.25 per acre per year on the

---

**13.** Collier tract, 1946–56, Cheatham-Colvin lease, 1948–58. Exhibit A in the Cheatham-Colvin lease, 1948–58, followed a different format but contained the same restrictions for "lands not now in cultivation" as Exhibit A in other leases in the 1946–51 program.

5th Broadacres Ranch (Damman, 1945–51) lease.

Over time, increases in cash rentals gave effect to prior improvements and the rentals reflected distinctions between irrigable land and desert land. In the early part of the 1946–51 program, cash rentals had one rate for the first half of the term and a higher rate for the last 5 years of the term. From June 1947, the cash rental was stable throughout the 10-year term. The following chart shows cash rentals on the various leases:

### Broadacres Ranch

| Term | Acres | Cash Rental |
| --- | --- | --- |
| 1918–26 | 2,600 | None to Indians* |
| 1926–36 | 2,500 | $7,500 per term ($0.30/acre/year) |
| 1936–46 | 1,200 | $12.25/acre/year |
| 1943–46 | 1,004.59 irrigable | $4/per acre/year |
|  | 159.63 desert | $0.10/acre/year |
| 1945–51** | 1,334.38 cultivated | $15.25/acre/year |
|  | 30.09 desert (irrigable) | $2.50/acre/year |
|  | 200.53 desert | $0.25/acre/year |
| 1951–61** | 1,511.88 cultivated | $10.50/acre/year–5 yrs. |
|  |  | $12.50/acre/year–5 yrs. |
|  | 193.12 desert | $0.25/acre/year–10 yrs. |

\* Lessee also agreed to pay $1.25/acre/year for electric plant construction cost to a maximum of $10/acre.

### Lone Butte Farm Tract

| Term | Acres | Cash Rental |
| --- | --- | --- |
| 1929–39 | 1,840 | $1/acre/year for 4 yrs. |
|  |  | $1.50/acre/year for next 3 yrs. |
|  |  | $1.99/acre/year–8th yr. |
|  |  | $3/acre/year–9th yr. |
|  |  | $4/acre/year–10th yr. |
| 1930–39 | 200* |  |
| 1939–43 | 1,969.87 | $6,000 per year ($3.05/acre/year) |
| 1943–48 | 1,949.62 irrigable | $5.50/acre/year |
|  | 20 well location | $5.50/acre/year |
|  | 20 campsite | $1/acre/year |
| 1948–53** | 1,949.62 irrigable | $6/acre/year |
|  | 20 well location | $6/acre/year |
|  | 20 campsite | $1/acre/year |

\* acreage added to 1929–39 lease.

### Collier Tract

| Term | Unit | Acres | Cash Rental |
| --- | --- | --- | --- |
| 1941–46 |  | 486.02 | $4/acre/year |
| 1946–56** | Unit 1 | 486.02 | $5/acre/year |
|  | Unit 2 | 443.74 irrigable | $2.50/acre/year–5 yrs. |
|  |  |  | $5/acre/year–5 yrs. |
|  |  | 133.89 desert | $0.25/acre/year |
|  | Unit 3 | 78.58 irrigable | $2.50/acre/year–5 yrs. |
|  |  |  | $5/acre/year–5 yrs. |
|  |  | 114.72 desert | $0.25/acre/year |

\*\* Part of 1946–51 program.

1946–51 Program

| Lessee | Term | Acres | Cash Rental |
|--------|------|-------|-------------|
| Price | 1946–56 | 252.29 | $2.50/acre/year–5 yrs. $5/acre/year–5 yrs. |
| Johnson | 1946–56 | 297.66 | $2.50/acre/year–5 yrs. $5/acre/year–5 yrs. |
| Price | 1947–56 | 440.50 | $2.50/acre/year–5 yrs. $5/acre/year–5 yrs. |
| Bogle Farms, Inc. | 1947–56 | 758.34 | $2.50/acre/year–5 yrs. $5/acre/year–5 yrs. |
| Hanna | 1947–57 | 611.47 | $2.50/acre/year–5 yrs. $5/acre/year–5 yrs. |
| Hanna | 1947–57 | 544.34 | $2.50/acre/year–5 yrs. $5/acre/year–5 yrs. |
| Ward | 1947–57 | 50 | $5/acre/year |
| Colvin & Wilden | 1948–58 | 207.13 cult. 128.98 desert | $3.75/acre/year $0.25/acre/year |
| Kubelsky & Pitrat | 1948–58 | 263.46 cult. 255.93 desert | $3.75/acre/year $0.25/acre/year |
| Cheatham & Colvin | 1948–58 | 369.31 cult. 167.42 desert | $3.75/acre/year $0.25/acre/year |
| Cheatham & Cheatham | 1949–59 | 271.7146 cult. 268.5315 desert | $15/acre/year $3.75/acre/year |
| Kubelsky & Pitrat | 1949–59 | 274.13 | $3.75/acre/year |
| Colvin | 1949–58 | 451.04 | $3.75/acre/year |
| Wilden | 1949–58 | 160 | $3.75/acre/year |

## DISPOSITION

Disposition of plaintiffs' claims is complicated by the state of the record. Plaintiffs' claims, initially set forth in petitions filed August 14, 1951, were restated on June 12, 1968, in the light of 17 years of Commission and judicial rulings. All of these claims concern activities that transpired or were set in motion prior to August 13, 1946. Primarily, evidence is documentary. It is an amalgam of ancient documents contemporary with the events involved, analyses of historical documents and events by experts in numerous physical and social science disciplines, and 3 days of testimony by those experts about their reports.

The record was compiled initially by the Indian Claims Commission; and subsequently the files physically were transferred to the Court of Claims. Both parties have experienced changes in personnel in preparation and presentation of these claims. Defendant has been represented by four attorneys of record; and the United States' litigating files have been moved many times, with loss of exhibits and attorney work product. A loss, defendant asserts, that has placed a "real and unfair burden for counsel for the United States."

Both parties have relied upon services of numerous experts. The restatement of claims into separate dockets has produced a situation where the same expert report

could be utilized, with different emphasis, in more than one of the separated dockets.

In the years since the claims were filed in 1951, numerous decisions have defined the terms and illuminated the legal doctrines applicable to Indian claims within the purview of the Act. In these dockets, plaintiffs' arguments reflect tailoring and adjustments to take advantage of new developments in legal concepts that were not available at the time the claims were filed in 1951, or tried in 1972. Proof in these dockets was closed by the Commission on January 10, 1973. After transfer in 1978, proof was reopened on plaintiffs' motion to permit inclusion of information that had been discovered or developed after the 1972 trial. At trial, plaintiffs' experts' reports and testimony emphasized that there were on the reservation approximately 80,000 acres of irrigable land outside the San Carlos Project, that 24,622 acres were irrigated primarily with pumps, and that 55,360 acres suitable for irrigation had not been subjugated. On the basis of a report that had been made to plaintiffs on April 22, 1975, and admitted in evidence on April 3, 1979, plaintiffs have requested a liability finding of fact (No. 7) in Docket 236 I as follows: "With adequate irrigation there are more than 250,000 arable acres suitable for irrigation on the reservation."

The April 3, 1979, order closing proof admits in evidence a deposition of Dr. George W. Barr that had been taken April 28, 1978. This deposition, and its related exhibits, contained Dr. Barr's analysis of leasing practices and fair market rental values of improved and developed lands in south-central Arizona. It had been prepared for and admitted in evidence in the claims of another group of Indians in another commission docket.[14]

Prior to final briefing, counsel verified and certified that all documentary evidence that had been admitted at the 1972 trial physically had been transferred and that legible copies were available. As a consequence, the parties' final arguments are based on the record presented to the Indian Claims Commission, as supplemented by the additional information admitted in evidence on April 3, 1979. Notwithstanding this latitude in enlargement of the record, evidence relative to leases during the 1918–51 period is fragmentary. The record, for example, does not contain a copy of either the contract made in 1917, between the Tempe Drainage District and the Secretary of the Interior, or the contract made in 1923 with the SRVWUA, that gave the Indians a right to water in the Tempe Drain to irrigate reservation lands. Nor does the record contain a copy of any contract between a lessee and the SRVWUA that deals with purchases of water to irrigate leased reservation lands. The parties bear the responsibility for many such deficiencies in the record.

The basic issue for disposition in these dockets involves the nature of the obligations assumed or imposed upon the United States when it administers reservation lands. When the superintendent of the Pima Agency, as the representative of the United States, undertook to lease reservation land to third parties, what duties were owed and what standard applies to the exercise of such duties? Further, did the United States, acting through the superintendent of the Pima Agency, have the special relationship to plaintiffs that is required to invoke the fair and honorable dealings jurisdiction of the Indian Claims Commission Act? Was the United States obligated to protect plaintiffs' irrigation agriculture through the development of reservation ground water resources to irrigate reservation land outside the San Carlos Project?

Plaintiffs contend that a trust relationship was created by virtue of the supervision and control exercised in leasing reser-

---

**14.** Docket 235: *American Indians Residing on the Maricopa-Ak Chin Reservation v. United States,* 667 F.2d 980, 229 Ct.Cl. 167 (1981). In plaintiffs' requested findings of fact, Dr. Barr's deposition and reports are relied upon, in addition to the reports and testimony of plaintiffs' experts which were presented at the 1972 trial, to support contentions of fair market rental values and leasing practices.

vation lands and that defendant is liable as a fiduciary for its conduct in the leasing program. Defendant contends no fiduciary obligation exists in the absence of an express provision in a treaty, agreement, Executive order or a statute that creates a trust relationship. Defendant argues it had no duty to develop tribal lands or ground water resources, and there was no legal obligation to assist plaintiffs in leasing tribal land. Defendant views the services provided by affirmative actions in the leasing program, in the absence of a specific duty to act, as gratuitous assistance to the Indians, which is insufficient to establish a fiduciary obligation.

■ Defendant is in error. There need not be a document that says in specific terms that a trust or fiduciary relationship exists or is created. Such relationship can arise from the nature of defendant's transactions and activities with Indian land and property. A general trust relationship between the United States and the Indian people is undisputed. The Supreme Court has emphasized that the Government's dealings with Indians historically has recognized "the distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people." [15] The Court of Claims has held that a special jurisdictional statute making ordinary fiduciary standards applicable to the United States "add[s] little to the settled doctrine that the United States, as regards its dealings with the property of the Indians, is a trustee." [16]

The Court of Claims has delineated the range of activities that can serve as a basis from which a fiduciary relationship may be inferred. Where the Federal Government takes on, or has control or supervision over, tribal monies or properties, a fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute or other fundamental document about a trust fund or a trust or fiduciary connection.[17] If no tribal money or property is involved, however, and the issue is whether the United States has a general fiduciary obligation to educate Indians, the existence of a special relationship for that purpose depends upon the proper interpretation of the terms of some authorizing statute, treaty or Executive order.[18]

■ In these cases, the United States actively exercised a wide range of control in leasing plaintiffs' reservation. The Pima Agency superintendent initiated, negotiated, implemented and supervised the leases. This involvement in the leasing of reservation lands, brought a fiduciary relationship into existence that makes the United States liable as a trustee engaged in the management of trust property.

■ The standard that applies to test liability for breach of fiduciary obligations

---

**15.** *United States v. Mitchell,* 463 U.S. 206, 225, 103 S.Ct. 2961, 2972, 77 L.Ed.2d 580 (1983) (*Mitchell II*), citing *Seminole Nation v. United States,* 316 U.S. 286, 296, 62 S.Ct. 1049, 1054, 86 L.Ed.2d 1480 (1942). The *Mitchell* litigation includes two Court of Claims opinions and two Supreme Court opinions: *Mitchell I* is the Court of Claims opinion at 591 F.2d 1300 (Ct.Cl.1979), and the Supreme Court decision at 445 U.S. 435, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980); *Mitchell II* is the Court of Claims decision at 664 F.2d 265, 229 Ct.Cl. 1 (1981) (*en banc*), and the Supreme Court decision at 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983).

**16.** *The Menominee Tribe of Indians v. United States,* 101 Ct.Cl. 10, 19 (1944).

**17.** *Navajo Tribe of Indians v. United States,* 624 F.2d 981, 987, 224 Ct.Cl. 171 (1980), and cases there cited. Approved in *Mitchell II,* 463 U.S. at 225, 103 S.Ct. at 2972.

**18.** *Gila River Pima-Maricopa Indian Community,* 427 F.2d 1194, 190 Ct.Cl. 790. There is some confusion in terminology. The Court of Claims in *Mitchell II* used the term "general fiduciary obligation" to identify a complete trust that is fully accountable and is different from the "special trust imposed by the Allotment Act." 664 F.2d at 270. The same usage appears in *Navajo Tribe,* 624 F.2d at 987. The Supreme Court, on the other hand, uses the term "a general trust relationship" in the restricted sense equivalent to the "limited trust relationship" or the "bare trust" created by the Allotment Act. *Mitchell II,* 463 U.S. at 225, 103 S.Ct. at 2972.

is that the Government's actions are to be judged according to standards applicable to a trustee in the management of trust property. The fiduciary must exercise due care and prudence to preserve the trust property.[19] The standard of duty as trustee for Indians is not mere reasonableness but the highest fiduciary standards.[20]

In Docket 236 F, plaintiffs' claims relative to development of ground water resources are brought under the "fair and honorable dealings" clause in Section 2(5) of the Indian Claims Commission Act.[21] That provision provided an extraordinary remedy and authorized the Indian Claims Commission to recognize claims that could not be compensated under any existing rule of law or equity. It was "designed to correct certain evils of long standing and well known to Congress."[22] While the remedial purposes of this authority should be effectuated, the scope of this extraordinary remedy should not be unduly extended.[23]

In previous litigation with these plaintiffs, judges of the Court of Claims have observed that the fair and honorable dealings clause did not authorize the Commission to be the arbiter of every possible dispute that might have arisen between the United States and the Indians in 170 years of history, or that it was to settle every grievance.[24] Judge Davis in 1970 had the following comment:

> But it would be wrong for judges to read into the Indian Claims Commission Act, passed almost twenty-five years ago, currents of thought which are emerging to-

day but were not infused into that 1946 statute. The Act was not designed to grant compensation for all the detriment accruing to the Indians by our ongoing policy toward them but, rather, had the more limited goal of paying for specific deprivations of land or property or rights protected by treaty, statute, or then-existing law. The instances cited in the Congressional history are of that kind. There is no intimation at all in the legislative background that the "fair and honorable dealings" clause was a catch-all allowing monetary redress for the general harm—psychological, social, cultural, economic—done the Indians by the historical national policy of semi-apartheid.[25]

The fair and honorable dealings clause has been applied by the Indian Claims Commission and by the Court of Claims in a number of cases. The following criteria are required. There must be a showing: (1) of a special relationship in which the United States undertook an obligation; (2) that the obligation was owed to the tribe; (3) that the United States did not do what it was required to do in the circumstances to meet its obligation; and (4) that the tribe suffered damages as a result.[26] The special relationship required to state a claim for breach of fair and honorable dealings must be evidenced clearly in official actions embodied in treaties, statutes or Executive orders. There must be a showing that the United States by its own acts affirmatively undertook special duties.[27] In addition to showing a special relationship, the Indians

---

**19.** *Coast Indian Community v. United States,* 550 F.2d 639, 652–53, 213 Ct.Cl. 129 (1977).

**20.** *United States v. Mason,* 412 U.S. 391, 398, 93 S.Ct. 2202, 2207, 37 L.Ed.2d 22 (1973); *Cheyenne Arapaho Tribes of Okl. v. United States,* 512 F.2d 1390, 1396, 206 Ct.Cl. 340 (1975).

**21.** 25 U.S.C. § 70a(5) (1976).

**22.** *Otoe and Missouria Tribe of Indians v. United States,* 131 F.Supp. 265, 271, 131 Ct.Cl. 593, *cert. denied,* 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955).

**23.** *Gila River Pima-Maricopa Indian Community v. United States,* 190 Ct.Cl. 790, 797, 427 F.2d 1194 (1970).

**24.** *Id.* at 803, 427 F.2d 1194, *Nichols,* Judge, concurring.

**25.** *Id.* at 802, 427 F.2d 1194, *Davis,* Judge concurring.

**26.** *Aleut Community of St. Paul Island v. United States,* 480 F.2d 831, 839, 202 Ct.Cl. 182 (1973).

**27.** *Id.* at 841; *Gila River Pima-Maricopa Indian Community,* 427 F.2d at 1198–99; *see also: United States v. Goshute Tribe or Identifiable Group,* 512 F.2d 1398, 1400–01, 206 Ct.Cl. 401 (1975); *United States v. Sioux Nation of Indians,* 518 F.2d 1298, 1302, 207 Ct.Cl. 234 (1975).

must demonstrate that the Government failed in its obligations to the tribe as a tribe.[28] Where the Government assumes such an obligation, it can be liable even if a third party actually inflicts the injury.[29] The standard to test liability for breach of fair and honorable dealings is: did the Federal Government do whatever it was required to do in the circumstances? [30]

Leasing Program

### Post-1946 Jurisdiction

The Indian Claims Commission Act provided that "no claim accruing after the date of approval of this Act [August 13, 1946] shall be considered by the Commission." [31] Plaintiffs divide the leases into three periods: (1) 1918–40; (2) 1941–58; and (3) 1957–present, and argue that all of the leases are part of a program that began prior to August 13, 1946, and continued thereafter. Defendant contends that each lease was issued and arrived at as a unique and separate action. Accordingly, defendant argues that all leases issued after August 13, 1946, are beyond the jurisdiction of the Indian Claims Commission and the jurisdiction of this court in these dockets. As to the post-August 13, 1946, leases, defendant asserts that any claims thereunder should have been brought under 28 U.S.C. § 1505 (1982).

Delineation of the jurisdiction of the Commission under the Act, and of the courts under 28 U.S.C. § 1505, as to Indian wrongs said to have occurred after August 13, 1946, but which had roots before, has developed through cases brought by plaintiffs.[32] In those cases, the Indian Claims Commission was found to have jurisdiction

to award just compensation when the full content of acts that occurred prior to 1946 did not become apparent until thereafter. The question of jurisdiction with respect to continuing claims was resolved by the Court of Claims in *Navajo Tribe* in 1978, after an extensive examination of the relevant statutes, the GRIC cases and other case law.[33] In *Navajo Tribe*, the court stated:

> We think that the only acceptable way to read these *Gila River* decisions in 1956 and 1962 is as a holding by this court that, if a wrongful course of governmental conduct began before August 13, 1946 and continued thereafter, the Commission could properly take account of and award relief for the damages or injuries suffered after that date from the continuing course of conduct which began prior to that time.[34]

In 1971, when Docket 236 F was before the Indian Claims Commission, defendant brought a motion for preliminary adjudication, and moved, among other things, for a determination that leases or permits dated after August 13, 1946, were outside the jurisdiction of the Commission because claims which accrued after that date are excluded under the Indian Claims Commission Act.[35] The Commission determined there were not enough facts for a decision, and denied defendant's motion without prejudice. The Commission noted:

> Presumably, the plaintiff's basis for recovery is that the entire leasing policy as administered by the government, of which the leases are evidence, gave rise to the initial wrongdoing accruing prior

**28.** *Navajo Tribe of Indians v. United States,* 364 F.2d 320, 176 Ct.Cl. 502 (1966).

**29.** *Lipan Apache Tribe v. United States,* 180 Ct.Cl. 487 (1967).

**30.** *Aleut Community of St. Paul Island,* 480 F.2d at 841; *Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, 494 (1964).

**31.** Codified at 25 U.S.C. § 70a (1976).

**32.** *See* cases styled *Gila River Pima-Maricopa Indian Community v. United States,* at 140

F.Supp. 776, 135 Ct.Cl. 180 (1956), at 157 Ct.Cl. 941 (1962), and at 586 F.2d 209, 218 Ct.Cl. 74 (1978).

**33.** *Navajo Tribe v. United States,* 586 F.2d 192, 218 Ct.Cl. 11 (1978); *American Indians Residing on the Maricopa Ak-Chin Reservation v. United States,* 667 F.2d 980, 229 Ct.Cl. 167 (1981) (lease program authorized prior to Aug. 13, 1946, and leases made thereafter for 10-year terms starting Jan. 1, 1947).

**34.** *Navajo Tribe,* 586 F.2d at 198.

**35.** 25 Ind.Cl.Comm. 305.

to 1946. The cause of action being a continuing one, as evidenced by leases, gives this Commission jurisdiction to award damages, as measured by the leases. Apparently this was the basis upon which the Court of Claims in 1962 resolved its jurisdictional question with respect to the identical claim. If, on the other hand, plaintiff's theory of recovery is founded on wrongful acts arising independently and separately out of each single lease of plaintiff's lands, defendant's objection to our jurisdiction would have merit.[36]

When the *Navajo Tribe* standard is applied to leases of reservation lands outside the San Carlos Project, the leasing program divides into two periods within the August 13, 1946, jurisdictional cutoff. Leases made in the 1918–46 period were dominated by availability of water for irrigation from the Tempe Drain. Leases made in the 1946–51 period were dominated by the conclusion that the Buckeye-Arlington agreements prohibited the drilling of wells on the reservation, except for the four tracts of land specifically mentioned in the agreements. This interpretation led to the conclusion that any new additional acreage to be developed would require the irrigation water to come from a source off the reservation.

All of the leases in the 1918–46 period were entered before August 13, 1946. There is no question that the Commission and this court has jurisdiction over claims arising from those leases. Leases in the 1946–51 period all were made on the basis of the authority granted to the Pima Agency superintendent on May 26, 1945, by the Office of Indian Affairs. Pursuant to that authority, the Pima Agency made six leases in 1946, six leases in 1947, four leases in 1948, and one each in 1949 and 1951. Accordingly, prior to August 13, 1946, defendant had set in motion a program, which was approved on May 26, 1945, to lease additional land along the boundary of the reservation which was to be irrigated from sources outside of the reservation, and to

renew old leases under conditions within the exceptions in the Buckeye/Arlington Agreements. This program was continuing; it included the leases made in the 1946–51 period.

In 1950, plaintiffs' counsel began a formal challenge of the Indian Affairs Office's interpretation of the Buckeye/Arlington Agreements. On August 24, 1950, in a letter to the Pima Agency superintendent, plaintiffs' counsel criticized the agency determination and argued that the Buckeye Agreement would not prohibit Indians from drilling wells to tap percolating waters under the reservation. The letter distinguished flows of the Gila River (both surface and subsurface) from percolating waters. Plaintiffs' counsel conceded that "every drop of the Gila River has been appropriated, whether this flow is above ground or underground, and no wells can be drilled by the Indians which take water from the subsurface flow of the Gila River unless that water is counted as appropriated by them." He recommended that the agency policy be changed so that improvement leases could require that wells be drilled on the reservation. The letter continued:

In the event it should be held by the solicitor's office or anyone else in authority that my opinion is incorrect in this matter, and that wells can not be drilled on the reservation, then and in that event each improvement lease should provide that the well which is to be drilled off the reservation should be on land owned by the lessee, and that the lessee will upon the termination of the lease deed to the Indian Community that land on which the well is located, together with the necessary rights of way for the carrying of water from the well to reservation.

On August 28, 1950, the superintendent forwarded plaintiffs' counsel's request for a change in policy. He included the following explanation:

Mr. Cox takes issue with us on the restraint we impose upon the drilling of wells, except on the four parcels of land

36. *Id.* at 308.

which are specifically mentioned in the Buckeye Agreement. These four leased areas—namely, Broadacre, Lone Butte, Collier, and Cheatham leases—are mentioned in the agreement as being exempt from the well-drilling ban; but it has been my interpretation, and I believe that of yourself and others in the Indian Office, that all other areas of the reservation outside the San Carlos project have been prohibited from the drilling of wells. This accounts for the fact that many improvement leases along the boundary of the reservation have been developed by bringing in water from wells located on white-owned land adjacent to the reservation.

The superintendent supported a change in policy. He stated:

I fervently hope that the interpretation given by Mr. Cox is correct, for it seems rather discriminating for the Salt River Valley lands lying adjacent to the reservation to be permitted to drill wells at will, while across the line on Indian lands no drilling is permitted.

In the absence of a response, plaintiffs' attorney on April 23, 1951, reiterated a request for an interpretation of the Buckeye Agreement. He restated his argument that the Buckeye Agreement deals with surface and underground flow of the Gila River and that the Indians agreed to limit the pumping of such subsurface flow of the Gila. The agreement, however, "in no wise limits or restricts the pumping of percolating water."

On April 25, 1951, the superintendent again asked the Indian Office for an interpretation of the Buckeye Agreement. He noted that he had been instructed by the Washington office that no pumping or land development outside the San Carlos Project and the four leases "is permitted under the Buckeye Agreement," and that Mr. Cox "feels that this interpretation is incorrect."

On December 20, 1951, the Acting Commissioner of the Office of Indian Affairs provided an official interpretation of the Buckeye Agreement. The new interpretation included the following:

1. The Buckeye agreement applies primarily to the use of the waters of the Gila River, both the surface and the subsurface flow, for the irrigation of 100,546 acres of San Carlos irrigation project lands, plus 1,545 acres of Florence-Casa Grande project lands not in the San Carlos project, plus 2,992.5 acres of nonproject Indian lands under the Gila crossing irrigation system.

2. The Buckeye agreement specifically consents to the irrigation of, and acknowledges the right of the Government to irrigate, 4,465.505 acres of land comprising the "Lone Butte", the "Broad Acres Ranch", the "Collier Lease Farm", and the "Cheatham Lease Farm" with water pumped from wells and with "Tempe Drain" water, regardless of whether the water is or is not a part of the Gila River.

3. Except as indicated in 2 above, the Buckeye Agreement neither permits nor prohibits the irrigation of lands outside the San Carlos irrigation project with water that is not a part of the Gila River surface or subsurface flow. It does not apply to such lands or water.

4. If the proposed wells on Pima Indian lands outside the San Carlos irrigation project will not, as a matter of fact, tap the subsurface flow of the Gila River or its tributaries, the drilling of the wells will not violate any of the provisions of the Buckeye agreement. However, it may provoke litigation based upon the contention, which the plaintiffs would have the burden of proving, that the wells do in fact take water from the subsurface flow of the Gila River. Proposed development leases calling for the drilling of wells need not be disapproved merely because of the prospect of litigation if the lessee is willing to proceed.

At the expiration of the leases made in the 1946–51 period, a new program based on this interpretation was instituted. The new leases made in 1956–57 incorporated the recommendation of plaintiffs' counsel that lessees should be required either to drill wells on the reservation, or to deed the

off-reservation wells to the Indians. The nine leases plaintiffs have identified as representative of the 1957–present period were not a continuation of the 1946–51 program. Although the same land may have been involved, the objectives and the requirements of new leases made after the expiration of the 1946–51 program were distinct and separate.

Leases in plaintiffs' 1957–present period were not a continuation of a leasing program that had commenced before August 13, 1946. Accordingly, this court does not have jurisdiction, under the authority derived from the Indian Claims Commission Act, to address claims that may arise from those leases.

*Claims*

■ In both dockets, plaintiffs' final statement of claims invokes the trust relationship that was created through the United States' control and management of reservation lands. Plaintiffs state the following claims:

(1) Breach of trust by requiring lessees to contract with SRVWUA for water to which plaintiffs already were entitled.

(2) Breach of trust by adding to development leases a requirement that the lessee obtain irrigation water from off-reservation sources.

(3) Breach of trust by failing to obtain reasonable cash rentals in development leases.

(4) Breach of trust by successive development leases on same tracts of lands.

(5) Breach of trust by discouraging, delaying and withholding approval of leases.

(6) Breach of special obligation under fair and honorable dealings standard to protect reservation ground water resources and plaintiffs' irrigation agriculture.

**(1) Requirement to Purchase Water From SRVWUA.**

This claim is based upon various references to the 1917 contract with the Tempe Drainage District, and the 1923 contract with its successor, SRVWUA, which enti-

tled plaintiffs to drainage water in the Tempe Drain. Although these contracts are not in evidence and their precise terms are unknown, defendant does not dispute that such contractual arrangements existed. References in lease documents, in the Indian Bureau's correspondence and internal memoranda, and the report of plaintiffs' expert, W.S. Gookin and Associates, support the conclusion that plaintiffs in fact had a right to the natural flow of tail water in the Tempe Drain.

Plaintiffs argue that, when reservation land that could be irrigated with this drainage water was leased, the superintendent ignored the Tempe Drain contracts and required the lessees to contract directly with the SRVWUA for the same water to which plaintiffs were entitled. If in fact the lessees were required to purchase water the Indians already had a right to receive, there would be a clear breach of trust. In effect, the SRVWUA would be given trust property, represented by plaintiffs' contract right to receive water. Payment for such property should have been made to the Indians through higher rents.

This claim is concerned with the leases that were made during the 1918–46 period. Four leases in evidence, Broadacres Ranch, 1918–26, 1926–36, and 1945–51 and Lone Butte Farms tract, 1929–1939, contain provisions relative to purchases of water from the SRVWUA. The record supports the conclusion that Fowler, the original lessee, and subsequent lessees of the Broadacres Ranch and the Lone Butte Farms tract, in fact purchased water from the SRVWUA to irrigate reservation lands they had leased. The essential question is whether the lessees paid the SRVWUA for water the Indians owned.

Plaintiffs' contention that the lessees were required to pay for water the Indians already owned is contrary to the evidence. Plaintiffs' argument concentrates on materials in the record relative to purchases from the SRVWUA; it ignores the materials that establish that the tail water in the Tempe Drain was provided to the lessees free of charge. Purchases from the

SRVWUA were made by the lessees in order to supplement the water to which the Indians were entitled and which was provided to the lessees without charge. Although none of the lessees' contracts with the SRVWUA are in evidence, it is clear that the purchases from SRVWUA were for additional water that was not the subject matter of the 1917 and 1923 contracts.

Broadacres Ranch is the primary tract of land involved in this claim. In 1918, when the first lease was made, water from the Tempe Drain was standing on the reservation in a lake and in a swamp. Fowler sought the first lease in order to use this water. The lease provided the Indians with additional land outside the SCIP that would be subjugated for irrigation. Fowler knew he had a right to this water; his lease provided he could use water in the Tempe Drain without charge.

After Fowler entered the lease, a shortage developed because tail water in the Tempe Drain was not sufficient to irrigate all the acreage included. The natural flow, to which the Indians were entitled, was not sufficient or reliable enough to provide a dependable source for irrigation water. The shortage initially was caused by closing drainage wells after the SRVWUA consolidated with the Tempe Drainage District. Later the shortage was due to a general lowering of the water table. The subsequent lessees of Broadacres Ranch and the Lone Butte Farms tract had to supplement the free water from the Tempe Drain with ground water from wells on the reservation and with water purchased under contract from the SRVWUA.

Contrary to plaintiffs' assertion, these arrangements did not delegate control over the leasing of plaintiffs' reservation to the SRVWUA, or reduce the rental amounts the lessee should have paid plaintiffs. Purchases of water from the SRVWUA, by the lessees, in these circumstances, does not indicate a mismanagement of trust assets or a breach of trust obligations.

(2) Requirement for Lessee to Obtain Water from Off-Reservation Sources.

The initial Collier lease, 1941–46, and the leases in the 1946–51 period, required lessees of lands not theretofore in cultivation to provide irrigation water from off-reservation sources. Plaintiffs contend this requirement prevented the development of ground water wells on the reservation. In addition, plaintiffs contend that it gave control of leases of reservation lands to owners of land adjacent to and outside the reservation because only the owner of the adjacent land, or someone bidding with the owner's consent, could bring water to the reservation. As a result, plaintiffs argue, defendant breached its duty to administer the trust res solely for benefit of plaintiffs, and made the requirement for competitive bidding in 25 C.F.R. § 171.9 a sham.

The initial leases for reservation land outside the SCIP permitted or required irrigation wells to be drilled on reservation lands. The Buckeye/Arlington litigation, filed in September 1929, however, challenged the right of the United States to deal with waters available to irrigate reservation lands, whether such lands were inside or outside the SCIP. This litigation had an impact on the program to lease non-SCIP lands, as well as on any development of underground water resources.

The issues in the Buckeye/Arlington litigation were not resolved by agreement, until 1941, and the settlement did not become final until Congress had approved appropriations in 1947. After 1929, and until the settlement in 1947, any request to lease additional areas of the reservation, and any request to drill wells outside SCIP lands, were considered in the light of potential impact on negotiations for a settlement.[37] The legal issues involved in the

---

**37.** During part of this period, negotiations also were pending in litigation the United States had instituted on Oct. 2, 1925, against all non-Indian users of Gila River water upstream from the reservation to the Duncan-Virden Valley, for a determination of water rights. That suit (Globe Equity No. 59, United States District Court for District of Arizona) was terminated by a consent decree, notable for its complexity, entered June 29, 1935. The decree was based on a stipulation

Buckeye/Arlington litigation were complex. In the light of the potential exposure, as well as the costs and time involved in resolving these issues, it was not improper or unreasonable for the Pima Agency to defer leases and drilling on lands outside the SCIP which arguably could jeopardize settlement. The Buckeye/Arlington litigation settlement involved cash payments totalling $114,000 by the United States [38] in exchange for, among other things: a release of all claims of damage for past and future diversions of Gila River waters; a right to pump from the subsurface flow of the Gila River to the western boundary of the SCIP; a release from all claims for past irrigation as well as a right to continue irrigation, of four named tracts outside the SCIP (Broadacres Ranch, Lone Butte Farms, Collier tract farm and Cheatham tract farm); and a right to drill new wells to irrigate those farms.

Until 1951, the Indian Bureau and the Pima Agency interpreted the settlement as restricting all drilling on the reservation to SCIP lands and the non-project lands that were named in the settlement. Leases for any new, additional acreage to be developed, accordingly, would require that the water come from a source off the reservation.

The Buckeye/Arlington settlement is the primary reason why the Indian Bureau in 1945 authorized and the Pima Agency implemented, a leasing program that required an off-reservation source of water. At that time, the considered judgment of the officials responsible for the reservation was that the only way plaintiffs could get reservation lands outside the SCIP developed was by obtaining water off the reservation.

It was recognized that these development leases were incomplete because a source of water was not assured. The Indian Bureau also recognized that the requirement for off-reservation irrigation water would inhibit development of reserva-

tion lands. Further, in renewals of leases for the same lands, without an assured water source, top rentals could not be obtained. The lack of an assured water source, would result initially in lower rentals, and on renewals would confine the rentals to the lower ranges that applied to development leases. The only alternative to such an incomplete leasing program, however, would be to permit the lands to remain desert. The interpretation of the Buckeye/Arlington Agreements that was followed by the Indian Bureau for the 1946–51 period was reasonable at that time.

Plaintiffs now contend that the settlement in the Buckeye/Arlington litigation neither justified a prohibition against drilling on the reservation, nor a requirement in the leases that irrigation water be obtained from off-reservation sources. Plaintiffs' argument is grounded on hindsight, and disregards the refinements in water rights legal concepts that have matured in the post World War I era. When the Buckeye/Arlington litigation was instituted in 1929, the arcane body of water rights law was not as well defined as plaintiffs now see it.

The circumstance that plaintiffs' counsel in 1951 was able to persuade the Indian Bureau to alter its previous interpretation of the Buckeye/Arlington Agreements does not establish that the 1945 decision was unreasonable when made. Nor does the circumstance that, after the change in policy, wells were permitted to be drilled on the reservation without complaints from the Buckeye or Arlington Companies establish that the 1945 decision was unreasonable.

The reports by the parties' experts that have been admitted in evidence do not establish that, in fact, underground waters in the areas leased are not part of the subsurface flow of the Gila River, nor is it established on this record that the underground waters in the leased areas are percolating

---

of settlement signed by the Attorney General and the Secretary of the Interior.

**38.** Plaintiffs in a resolution dated Apr. 27, 1947, approved the payment of funds to the companies as provided in the settlement.

waters only. The subsurface area of the reservation admittedly contains underground reefs that alter water movements.

There has been no showing that the terms of the settlement, when agreed upon, involved a consideration of the distinction between the surface and subsurface flow of the Gila River on the one hand, in contrast to movement of percolating waters on the other. The distinction plaintiffs' counsel made in 1951 between the surface and subsurface flow of the Gila River and percolating waters under the reservation has not been shown to have entered the consideration of the parties (1) in 1929 when the Buckeye/Arlington litigation was instituted, (2) in 1938 when plaintiffs made a settlement offer, (3) in 1941 when the Secretary of the Interior agreed to the settlement, or (4) in 1947 when Congress acted to appropriate the funds for settlement.

Plaintiffs argue that defendant violated its duty under the competitive bidding regulation in 25 C.F.R. § 171.9 because the requirement for an off-reservation source of water limited bidding to the adjacent land owner and rendered competitive bidding illusory. Clearly, the requirement limited bidding to potential lessees who had access to a water source outside the reservation, normally the adjacent land owner. Defendant recognized that the off-reservation water requirement would limit the number of bidders.[39]

Throughout the leasing program the Pima Agency attempted to comply with the regulation to advertise properties for lease. From 1918 through 1951, there are only four instances where there is a question whether the lease was advertised. The advertising regulation provides a mechanism for the Commissioner of Indian Affairs, in appropriate cases, to waive the advertising requirement on request from the reservation superintendent. As to the four questionable leases, the record is not clear that the Commissioner had denied a request for a waiver. It appears that, in the initial leases on Broadacres Ranch and Lone Butte Farms, the lessees originated the transaction and negotiated terms that reflected the special development problems involved. The two leases in the 1946–51 program that may not have been advertised required the same rentals and development obligations as did neighboring leases that had been the product of the bidding process. In these circumstances, waivers by the Commissioner with respect to the four leases would be justified.

In summary as to this claim, in 1945, when the program for leasing reservation land along the borders of the reservation was authorized, the Indian Bureau justifiably was concerned with the provisions of the Buckeye/Arlington settlement. Its interpretation that the settlement prohibited drilling of wells outside SCIP lands was reasonable in 1946. Accordingly, the inclusion, in leases for development of additional reservation land, of provisions that required an off-reservation source of water was a decision that was reasonable when made. It was a good faith attempt to develop land for plaintiffs that otherwise would remain unproductive desert. The fact this restriction limited the number of potential bidders, and the Pima Agency recognized that such likely would be the result, does not render the advertising procedure an illusory sham, nor amount to a breach of Indian trust responsibilities.

(3) Failure to Obtain Reasonable Cash Rentals.

Defendant's control and management of the program to lease reservation lands carried a trust obligation to manage the lease program in a prudent and reasonable manner so as to obtain rentals that were adequate and fair. In a development lease, the value to the lessor consists of the combination of the cash rentals paid and the improvements installed to permit irrigated

---

**39.** In a Dec. 5, 1977, letter to S.J. Wilden, the Pima Agency transmitted an Invitation for Bids which provided for open bidding on Dec. 16, 1947. The letter included the following statement: "It is not likely that anyone else can bid on the land; however, in order to comply with the law we are advertising."

agriculture. Plaintiffs contend that the leasing program of the Pima Agency resulted in cash rentals that were grossly inadequate and unfair. Plaintiffs argue that customary leasing practices were not followed, that cash rentals were below prevailing fair market values, and that it was a breach of trust for leases of reservation lands to have extended terms with fixed rentals established at the beginning of the term.

Plaintiffs' calculations of fair cash rental values are based upon the reports and exhibits of its experts, Dr. George W. Barr [40] and W.S. Gookin and Associates, a consulting firm in Scottsdale, Arizona.[41] In their reports, plaintiffs' experts concluded that the common practice for leasing pump lands in central Arizona was on a share crop basis rather than for a cash rental. Further, when farms were leased for a cash rent, net rental was calculated year by year based on immediate previous annual net profits. Also, it was not customary to make cash agricultural leases for more than 170 acres for more than 3 years, and that agricultural leases for more than 10 years were not made.

Calculations of cash rentals by plaintiffs' experts are premised on a $\frac{1}{4}$–$\frac{3}{4}$ share crop division, in which the land owner received a minimum of $\frac{1}{4}$ of the gross crop and the farmer-lessee pays all costs. W.S. Gookin and Associates prepared a schedule assuming a crop mix of half cotton/half alfalfa,

of rental values per acre for farm land in central Arizona for each year 1917 to 1971. The table included a calculation for conversion to 1967 values. University of Arizona, College of Agriculture, publication: "Arizona Agricultural Statistics 1867 to 1965" was utilized to determine an average yield per acre (in lbs.) for "all hay" and "all cotton" grown in Arizona. This volume was multiplied by the average price per pound of the commodity to determine gross crop income. This was divided by 4 to derive the landlord's share and to determine the per acre fair rental value. The agricultural statistics used by the experts are averages for the State of Arizona, which may or may not reflect conditions applicable to farming on the reservation.

The schedule of rental values for farm land was applied to each year of the leases analyzed by plaintiffs' experts to determine an alleged fair rental value per acre for the full term, in addition to the improvements required. In the calculation, the rental for the first year was deducted as consideration for the cost of the improvements (clearing, leveling, fencing, constructing an irrigation system, and, when appropriate, the drilling and equipping of irrigation wells).

Plaintiffs state the calculations are offered not as a calculation of damages but as an indication of the disparity between the amount the Pima Agency secured for plaintiffs and the amount it was obliged to

**40.** Plaintiffs' expert, Dr. George W. Barr, was a respected specialist in agronomy, who from 1930 to 1957, had been associated with the Agricultural Extension Service, College of Agriculture, University of Arizona, and was editor of the Arizona Agricultural Bulletin. He did not testify at the December 1972 trial; his deposition was taken Apr. 28, 1978. His deposition and deposition exhibits were admitted in evidence by the Apr. 3, 1979, order closing proof. Dr. Barr is an acknowledged expert on agricultural leasing practices in central Arizona, and has published studies on ownership and operating tenures, and leasing practices in Pinal County, Arizona.

**41.** W.S. Gookin, Sr. is a civil engineer, whose experience in government includes: employment with the Bureau of Reclamation, Chief Engineer for the Arizona Interstate Stream Commission, Arizona State Water Engineer, Administrator of the Arizona Power Authority and Project Engineer for the San Carlos Irrigation and Drainage District. An authority on hydrography and hydrology, he prepared reports and testified concerning the development of pumping irrigation water in Arizona, development potential of the reservation, development of Arizona's cotton industry and the fair market rental value of land in south-central Arizona.

William Scudder Gookin, Jr. (Scudder Gookin) is a civil engineer with degrees in business administration, economics and finance. A recognized expert, he assisted in preparing the report on the development of pumping irrigation water in Arizona and was primarily responsible for gathering plaintiffs' information on fair market rental value, and the calculation of improvement costs.

obtain. Plaintiffs use as a standard the advertising requirement in 25 C.F.R. § 171.9 that competitive bidding be used in order to obtain "the highest possible rental." This disparity, according to plaintiffs, demonstrates liability for breach of trust obligations.

Plaintiffs, in their requested findings, presented calculations for 25 leases. Plaintiffs' calculations, indeed, indicate vast differences between the cash rental the lease required and what plaintiffs contend should have been obtained. These disparities are shown in the following examples. The first Broadacres Ranch lease, 1918–26, applied to 2,600 acres of reservation land and provided for no cash rental; the improvements to be made by the lessee was the entire consideration to the Indians. Plaintiffs' calculation of the fair rental value per acre for each year of the 8-year term was:

| 1918 | $22.59 |
|---|---|
| 1919 | $25.02 |
| 1920 | $16.26 |
| 1921 | $14.16 |
| 1922 | $12.89 |
| 1923 | $16.94 |
| 1924 | $14.96 |
| 1925 | $16.96 |
| 1926 | $11.55 |
| Total (excluding development year) | $117.19 |

This calculation produces a fair rental value for the full 8-year term of $117.19 cash per acre, in addition to the required improvements. Since there was no cash rental in the lease, the disparity amounts to $304,694.

In the initial Lone Butte Farms lease, 1929–39, the consideration negotiated by the Pima Agency was $1 per acre for the first 4 years; $1.50 per acre for the next 3 years; $1.99 per acre in the 8th year; $3 per acre in the 9th year; and $4 per acre for the 10th year. For the 1,840 acres of reservation land, the rental was equivalent to $17.50 per acre for the 10-year term, a total of $32,200. Plaintiffs calculate the fair rental value should have been:

| 1929 | $14.94 |
|---|---|
| 1930 | $10.43 |
| 1931 | $6.12 |
| 1932 | $5.39 |
| 1933 | $7.66 |
| 1934 | $10.81 |
| 1935 | $9.94 |
| 1936 | $11.17 |
| 1937 | $9.26 |
| 1938 | $8.15 |
| Total (excluding development year) | $78.93 |

Thus, the rental value for the full term, according to plaintiffs, was approximately $78.93 per acre in addition to improvements. This amounts to $145,231 for the 10-year term.

The initial Collier tract lease, 1941–46, included 486.02 acres and provided a cash rental of $4 per acre per year for the 5-year term, a total of $9,720.40. Similar calculations by plaintiffs produced a fair rental per acre for the 5 years of $80.84 cash in addition to the required improvements, a total of $39,289.85.

The first Price lease, 1946–56, covered 252.29 acres, with cash rentals of $2.50 per acre per year for 5 years, followed by $5 per acre per year for 5 years, or a total of $9,460.87 for the 10-year term. Plaintiffs' calculations produced a fair rental value of $421.60 cash per acre for the 10-year term of the lease, in addition to the required improvements. The total cash rentals, therefore, according to plaintiffs should have been $106,365. The second Price lease, 1947–56, covered 440.50 acres and had a rental of $2.50 per acre per year for 5 years, followed by $5 per acre per year for 5 years, or a total of $16,608.75 for the 10-year term. Plaintiffs calculated a rental value for the second Price lease at $395.93 per acre, plus required improvements, for the 10-year term. This calculation provides a cash rental that totals $174,407.16.

Plaintiffs' theory for computation of rental value for leased Indian lands was presented and considered in Docket 235 as a basis for computation of damages on the Ak-Chin reservation.[42] In Ak-Chin, plain-

42. *American Indians Residing on the Maricopa-Ak-Chin Reservation,* 229 Ct.Cl. 167, 667 F.2d 980.

tiffs there contended that the Pima Agency had breached fiduciary duties in a leasing program that had been initiated on March 5, 1946, and implemented by leases with terms that started January 1, 1947, or subsequently. In Docket 235, the superintendent of the Pima Agency was the same individual who administered plaintiffs' leases in these dockets. The Ak-Chin reservation is located a few miles south of plaintiffs' reservation, both reservations are located in Pinal County, Arizona, and the lands in both reservations have comparable geological and climatical conditions. The *Ak-Chin* leasing program was concerned with development leases on unimproved desert reservation lands, with 10-year terms and at fixed annual rentals.

In *Ak-Chin*, the valuation method plaintiffs advance in these dockets was presented by means of Dr. Barr's deposition and its related exhibits. The plaintiffs in *Ak-Chin* sought to use Dr. Barr's materials to show customary leasing practices in Pinal County and that the challenged leases deviated from the norm. The Court of Claims rejected Dr. Barr's evidence and the method of valuation advanced by plaintiffs in that case. The reasons for rejecting the experts' theory of valuation when it is used to establish damages apply with equal force, when as in these dockets, it is used to establish liability.

In *Ak-Chin*, the Court of Claims held that the leasing program implemented by the Pima Agency on that reservation was reasonable and prudent. Dr. Barr's assertions regarding customary practice as to agricultural development leases were found to be without support in the record. The court stated:

> Dr. Barr's testimony and his documentary materials were concerned with leasing practices that apply to improved and developed "pump lands" that had been put into irrigated cultivation in the Casa Grande Valley of south-central Arizona. No showing was made of the terms that

normally would be expected to apply to a lease of undeveloped land that provided both a cash rental and specified improvements.[43]

After reviewing Dr. Barr's evidence, the court concluded, even as to improved farm land, there was no customary practice as to share cropping or for annual computation of cash payments. The court stated:

> In Pinal County, according to the record, there was no "customary" leasing practice even with respect to improved farmland, and leasing practices relative to undeveloped farmland varied extensively. Dr. Barr's report shows that, in 1939, there were 330,455 acres in farm units, with 101,020 acres producing crops in the Casa Grande Valley. Approximately ¾ of the farm acreage was leased: about 40 percent on a cash basis; 20 percent on a 50–50 share basis; and the remaining 40 percent under a number of different types of leases. Cash leases largely were associated with smaller private ownerships. Seventy percent of the cash leases applied to units of less than 110 acres. Share leases on a 50–50 basis, largely applied to land ownerships ranging in acreage from 210 to 1,710 acres.
>
> In 1939, cash leases on private land ranged from $5 to a high of $22 per acre for land with a high AAA cotton allotment. Some development leases included payment of a nominal annual fee of less than $3 per acre. State lands were leased on a cash basis, rental rates were either 1, 1.5, 3 or 5 cents, or $1 per acre.[44]
>
> In 1947, the Arizona State Land Department had a program to develop irrigated agriculture by improvement leases. The State of Arizona had income from agricultural leases of 283,063.60 acres, during the 1947–48 fiscal year, that totaled $89,-000.42, or an average of $0.314 per acre.

**43.** *American Indians Residing on the Maricopa-Ak-Chin Reservation,* 667 F.2d at 992.

**44.** *Id.* at 992.

In these dockets, plaintiffs argue that the method of valuation employed by its experts, W.S. Gookin and Associates and Dr. Barr, shows that leases made by the Pima Agency between 1918 and 1951 on the Pima-Maricopa reservation were for less than the fair market rental value. There are 27 leases in issue. Of these, 14 were for previously undeveloped tracts on the reservation, portions of which were arable but which included some unsuitable desert land. Thirteen leases on Broadacres Ranch, Lone Butte Farms tract and the Collier tract involved a mixture of developed and undeveloped land. All of the lessees were required to subjugate the land and provide an irrigation system. Detailed requirements were specified to describe improvements to be installed under the leases. As in *Ak-Chin,* the development leases were for cash rentals and improvements. The land in issue in these dockets is the same type of land, undeveloped desert land, that was at issue in *Ak-Chin.* The leases involved in these dockets have the same characteristics of the leases in *Ak-Chin.* Plaintiffs' evidence and method of valuing the fair market rental value of the leases in these dockets have no more validity than they had in *Ak-Chin.* The reasons that required rejection of the method valuing fair market rental values advanced in *Ak-Chin* require rejection of plaintiffs' claims in these dockets.

Plaintiffs cite *Coast Indians Community* [45] as support for the contention that the "gross" disparity between fair rental values and the rents received in the lease program is sufficient to demonstrate liability as a trustee. The facts in these dockets are not comparable to the situation involved in *Coast Indians.* That case considered obligations of a trustee in the disposition of trust property. The facts showed an incompetent appraisal of plaintiffs' land, and a conveyance for $2,500 worth of land valued at $50,000. The disparity amounted to a 2,000 percent differential. Unless there is a showing that the

value realized is so far below fair market value as to constitute fraudulent conduct or gross negligence, a disparity in itself does not establish a breach of fiduciary responsibility. Mere evidence of a disparity between the value that the trustee realized in disposing of trust property and the fair market value at the time of that disposition, as later independently appraised, is not sufficient to establish negligence or other breach on the part of the trustee. [46]

In these dockets, plaintiffs have not established that lease rentals were less than fair market value. The alleged disparity between plaintiffs' computation of fair rental values and the cash rentals obtained by the Pima Agency does not establish a breach of trust responsibilities. It remains to be decided, however, whether the total values obtained in the leasing program by the Pima Agency reflect an imprudent policy or that the program as conceived provided for leases at less than fair and adequate rentals.

The requirement in the 1946–51 program that lessees provide irrigation water from off-reservation sources admittedly limited the utility of formal advertising and competitive bidding as procedures to assure that the Indians received total rentals that were adequate. Nonetheless, most of the leases involved received widespread advertising to all potential sources interested in a lease of reservation land. If such leases had such values as plaintiffs now contend, greater interest would have been shown.

Analysis of the adequacy of the cash rentals the Pima Agency negotiated on the leases of plaintiffs' lands requires that sources of alternative lands available for lease be considered, as well as consideration of obstacles to leasing that are particularly applicable to reservation lands. After World War II, Arizona had a program to use improvement leases to develop irrigated agriculture on state lands. This state program provided desert lands for develop-

---

**45.** *Coast Indians Community,* 213 Ct.Cl. 129, 550 F.2d 639.

**46.** *Id.* at 653.

ment leases at rentals at or below the rentals obtained for plaintiffs.

Defendant cites a number of factors that adversely affected the Pima Agency's attempts to lease reservation lands. These included:

(1) Reservation land could not be mortgaged, and banks were reluctant to help finance leases. A lessee of reservation land had to have substantial collateral, other than the lease, in order to obtain money to make the improvements the lease required.

(2) Section 5(b)(2) of the Charter of the Gila River Pima-Maricopa Community provided that only members of the community could lease tribal land. Tribal lands to be developed by non-members could only proceed under a revocable permit authorized by the Community Council.

(3) The mechanics of executing a lease for reservation lands was complicated. Most of the land available for lease was owned by individual Indian allottees. All individual owners of the land involved had to sign the lease. In some leases, this required as many as 70 signatures, and that number did not include the allottees who were deemed by the government to be absent, incompetent, or whose land was part of an unprobated estate.

Plaintiffs also contend that a term of 10 years was unreasonable for a development lease. This contention was considered and rejected in *Ak-Chin*. A development lease requires a term of sufficient length to assure the lessee may recapture subjugation costs and to provide the attraction of a reasonable profit. While a short-term cash lease, or a long-term share crop lease, may be attractive with respect to land that has been improved and has a productive history, such leases have little attraction for the development of unimproved lands on a remote reservation. A 10-year lease at a fixed annual rental, in the context of agricultural development of an unimproved res-

ervation, is not demonstrably so imprudent as to amount to a breach of trust.

The Court of Claims approved as reasonable an agricultural development lease for a term of 5 years when the consideration did not include any cash rental component.[47] When the 1946–51 program was initiated, Interior Department regulations applicable to leases of Indian land authorized a term of 10 years for irrigable lands.[48] A 10-year lease of Indian lands is authorized by statute.[49]

During the period 1918–51, the rentals obtained by the Pima Agency increased with the passage of time. The increases reflected past improvements that had been made to irrigate the land. The limitation on drilling on the reservation, which has been found to have been reasonable, necessarily reduced cash rentals available. On balance, considering all factors that bear upon an adequate and fair return on leases of reservation lands, plaintiffs have not established that the leases in issue were not made for adequate cash rentals or that defendant breached its duty as a trustee to obtain the highest rentals possible in the circumstances.

(4) Successive Development Leases on Same Tracts.

Plaintiffs' contention that there are breaches of trust obligations involved in successive development leases on the same tracts of land primarily is concerned with leases in the 1946–51 period and the requirement for an off-reservation source of water. The argument consists of a restatement of that claim, and it includes a combination of other claimed breaches of trust: failure to develop appurtenant water, failure to enforce provisions of development leases, failure to obtain adequate rentals, failure to administer the trust solely for plaintiffs' benefit, and misuse of development leases because improvements were illusory.

---

47. *Gila River Pima-Maricopa Indian Community v. United States,* 467 F.2d 1351, 1354, 199 Ct.Cl. 586 (1972).

48. 25 C.F.R. § 171.1 (1938).

49. 25 U.S.C. §§ 402a, 477 (1946).

Plaintiffs' claims, and the argument that there have been breaches of trust obligations, proceed from a specialized and narrow definition of a development/improvement lease. This definition, provided in the deposition of Dr. Barr, is used repeatedly in plaintiffs' requested findings of fact in the 25 leases for which separate findings were requested.[50] Dr. Barr's definition, and plaintiffs' argument is stated as follows:

The theory behind development leases is that the cost of developing the undeveloped arable land is paid from rental of the land, and lessor thereafter can farm the developed land or receive full rental from the developed land.... Defendant did not in fact require adequate development to permit plaintiffs to cultivate the "developed land" after the expiration of the "development lease." ... The purpose of the development/improvement lease was to finance the agricultural development of the leased lands so that at the end of the lease the lessor would receive possession of fully developed agricultural land which when farmed or leased would produce higher income than would undeveloped desert land. The development leases entered by defendant in the 1946–49 period did not satisfy the purpose of development leases because the source of irrigation water was off reservation and no one but the original lessee would lease the land again without further development.

Although this claim of breach of trust obligations, and plaintiffs' argument, focus mainly on leases made in the 1946–51 period, plaintiffs also extend it to the leases in the 1918–46 period in Broadacres Ranch, the Lone Butte Farms tract and the Collier tract.

Clearly, leases that were made in the 1918–46 period did involve successive renewals. They also provided, however, irrigation water from sources appurtenant to the reservation, either from wells on the reservation or through access to the Indians' rights to tail water in the Tempe Drain. Plaintiffs' concept of a development lease, therefore, insofar as it relates to off-reservation sources of water is in error as to these leases. Further, the facts do not support plaintiffs' contention that the Pima Agency failed to enforce the leases made during this period.

The initial lease of Broadacres Ranch, 1918–26, required the lessee to drill two wells at his own expense, at locations approved by the superintendent, and to equip the wells with centrifugal pumps and electric motors. The specifications in the lease provided in detail pumping capacity and approved equipment sources. Plaintiffs complain that the wells required by this lease were never equipped.

The lessee, Mr. Fowler, died in the fall of 1924, before the improvements were completed. Fowler had drilled three wells on the reservation, outside the leased area, but had not equipped the wells for operation. In 1924, the executors of the estate attempted to clear deficiencies in lease commitments with a cash settlement. To negotiate a settlement, the Pima Agency conducted an extensive survey during February and March 1925. It involved staking out 250 allotments, retracing all section lines, locating all fence lines and ditches and preparing a topographic map of the area. The survey showed that the greater part of the leased area then was under cultivation. Approximately 500 acres had not been prepared, due in part to natural conditions, deep washes, gravel banks and because several of the allotments could not be irrigated under the available canal system. Due to an error by the lessee on the lease boundaries, 40 acres in the leased area had not been subjugated, but a corresponding area outside the lease was being cultivated. Except for the 40 acres in error, the entire tract was found to be fenced on the outside, and part of the interior fencing had been constructed.

On June 15, 1926, on the basis of the survey, the Pima Agency superintendent settled with the estate for a cash considera-

50. Docket 236 I, Requested Findings Nos. 21–24, 26–30, 32–47.

tion of $12,500. The 253 Indian lessors received $40 each, with the balance of $2,380 to be held in a fund for the purpose of developing a water supply for 2,500 acres covered by the leases. Plaintiffs do not contend that this settlement was imprudent.

The second Broadacres Ranch lease, 1926–36, authorized the lessee to use the land primarily as a stock feeding enterprise, with the greater portion of the produce raised thereon to be fed to livestock on the premises. Improvements by the lessees included the obligations to complete construction of the fences along the exterior boundaries, to maintain and leave the fences in good condition at the end of the term, to repair and place in good condition the irrigation system, to maintain said irrigation system at all times, and to seed and maintain at least half the acreage in alfalfa, with at least 50 percent of the land to be left in alfalfa upon expiration of the lease. The value of these improvements was estimated at $12,000.

The three wells drilled on the reservation by the first lessee were equipped and operated during the San Carlos Farm Company lease, 1936–46. Under the Damman lease, 1943–46, the 1,004.59 acres of land improved for cultivation was supplied with water from three irrigation wells on the reservation and from tail water in the Tempe Drain. Supplemental water was purchased from the SRVWUA. The lease included detailed instructions for improvements relative to clearing, leveling and drainage, and fences.[51]

During the Taylor lease of Broadacres Ranch, 1951–61, the improvements in place included boundary fences, cross-fences, one domestic well and an irrigation system consisting of three irrigation wells located on

reservation land outside the leased area, main canals and field service laterals, headgates and bridges. In addition, the lessee was required, at his own expense, to drill three irrigation wells, at locations to be selected by the Pima Agency. The depth, capacity and equipment of the wells were specified in detail. The lease specified also that all irrigation wells and well equipment, irrigation and drainage structures, pipe lines, domestic wells and equipment, bridges, fences (including corrals), and power transmission lines or gas pipe lines (subject to distributor's contract which shall be approved by the superintendent) placed on the lands by the lessee shall remain thereon as part of the consideration for this lease, be in good working order, and shall become the property of the lessors and permittors upon termination of the lease. All pump equipment installed in both domestic and irrigation wells was required to be new equipment.

The initial lease, 1929–39, on Lone Butte Farms tract required the lessee at his own expense to "clear, level, border and place in cultivation all the tillable and irrigable land" before December 30, 1930. These improvements had an estimated value of not more than $30,000. The lessee further agreed, within 1 year, either to secure a contract from SRVWUA for sufficient water to irrigate the leased land, with an agreement to give the United States an option on that supply of water for 10 years additional after expiration of the lease, or if unable to secure such a contract, in the alternative, within 1 year to put down a sufficient number of wells and equip them with pumps adequate in number and capacity to irrigate said tract of land properly. The estimated value of that improvement was $30,000.

---

**51.** The provision relative to fences, for example, provided:

FENCES: The lessee shall construct a four-strand barbed wire fence on the north and west boundary lines of the leased land using 12½ gauge galvanized barbed wire (standard cattle wire) using mesquite or native cedar posts spaced not more than one rod apart. Line posts are to be not less than three inches

in diameter at the top and 6½ feet in length, to be firmly set in the ground. Corner posts are to be not less than five inches in diameter at the top, seven feet in length, set firmly in the ground, and braced on two sides in line with the fence. The corner posts are to be placed at each 1/16 corner (40 acre corner) and at each turn changing the alignment of the fence.

The Cox lease, 1943–48, on Lone Butte Farms tract, recited that equipment already in place included three wells fully equipped and that this equipment, plus the fencing and irrigation structures, belonged to the land. The Cox lease, 1948–53, on Lone Butte Farms tract, required the lessee to construct an additional irrigation well, not less than 20 inches in diameter and drilled to a depth not less than 350′.

The initial lease for the Collier tract, 1941–46, applied to 426.02 acres. It permitted the lessee to supply irrigation water from an irrigation well located on adjacent land belonging to the lessee. The second lease of the Collier tract, 1946–56, provided that the lessee would drill and equip an irrigation well on reservation lands to irrigate the acreage that had previously been leased. The well was to be drilled at the lessee's expense and would become the property of the Indian allottees that owned the previously leased land. The cash rental for the previously leased acreage was $5 per acre per year. The cash rental for the previously leased acreage was greater than the cash rentals for the additional new acreage also included in the lease.

Throughout the history of the Pima Agency's leasing program, representatives of the superintendent were careful to enforce the conditions of the lease and to assure compliance with terms agreed. One example in the record, which illustrates the degree of attention, involves the Colvin/Wilden lease, 1948–58, and the land clerk of the Pima Agency Lands Division. On March 8, 1948, the Pima Agency land clerk notified Mr. Wilden of the following encroachments:

> I noticed also that you have cleared and leveled all of the land under your lease, whereas, at the time the lease was being negotiated you proposed to put into cultivation only a portion of this land; therefore, it will be necessary that you pay the $3.75 per acre for all of the land that is being placed in cultivation. Please inform me if there is any of the area leased that has not been placed in cultivation for crops this year.

Mr. Hepworth, the reservation highway engineer, uncovered the survey corners on the east and west section line which is your north property line, and the corner at the cattle guard in the S/2–N/2–NE/4/–SE/4 of Section 20. He states that your corner post for your fence north of the reservation line is in its proper place. You, however, have encroached on the road right of way going south with your fence line. This road right of way is at the present time being reconstructed, and it will be necessary that you move your fence 35 feet from the section line. I have enclosed a small plat showing the fence line in question.

Plaintiffs' argument against successive leases of the same tracts is founded on the assumption that, unless a development lease provided to the Indians, at the end of the first lease term, all elements necessary to farm the land, including an adequate supply of water appurtenant to the land, the lease was unreasonable and therefore a breach of trust. Plaintiffs would require the first development/improvement lease to be complete in itself. At the end of its term, according to plaintiffs the land must be fully subjugated and provided with an adequate supply of appurtenant water so as to be usable, without more, to the Indians as irrigated farm land. At that time, all costs required for development and improvement would have been absorbed by the lessee in the first year of the term, and the Indian-lessor would be in a position to farm the land or to lease it at the higher rates applicable to fully developed pump lands. Implicit in plaintiffs' argument is the incorrect assumption that all of the value of the lease is lost if there is a failure to develop appurtenant water and if portions of the leased land revert to desert.

There is no per se rule that there necessarily must be a breach of trust when sufficient water is not available at the end of the lease term. Nor does the absence of water sufficient for fully irrigated farming establish that improvements commensurate with total rentals received have not been

694

made. The United States in approving a development lease does not undertake an obligation to insure the future profitability of the land at the end of the first term, or that the improvements for irrigation would never be lost, or that the land would never revert to desert. No trustee has such an obligation. If a trustee were required to insure the future profitability of leased lands, such a burden would cause the trustee, here the United States, to refuse to approve any development leases. That would of course cause the land to remain unproductive desert and would delay or prevent future development of potentially productive reservation land, as well as precluding any income during the interim of partial development.

To determine liability for breach of trust, it is necessary to consider all of the terms of the particular lease and evaluate its reasonableness in the context of the facts surrounding the lease arrangements. Although the benefits of development cannot be realized fully unless an adequate supply of water is available, partial development may be preferable to allowing the land otherwise to stand idle as desert, with no income realized at all.

The development leases made by the Pima Agency during the 1946–51 period provided income and improvements that otherwise would have been lost or postponed. There are approximately 5,352 irrigated acres with water in the Broadacres Ranch, Lone Butte Farms tract and the Collier tract. The 1946–51 program provided an additional 5,773 acres of reservation land that had been cleared, leveled, and bordered for irrigated agriculture, and on which dikes, channels, ditches and control structures had been installed.

The Pima Agency's leases were reasonable adjustments to factual circumstances involved in water rights in the Tempe Drain and the problems presented by the Arlington/Buckeye litigation. Successive leases of the same tracts of land for devel-

opment and improvement were not unreasonable when made, and do not, on the facts in the record, show a violation of trust responsibilities in the management of trust property. The leases do not show a misuse of leasing as a device to develop reservation lands on the ground the improvements were illusory. Nor do such leases constitute a violation of defendant's duty to obtain the best rentals possible.

(5) Discouraging, Delaying and Withholding Approval of Leases.

In 1939 and 1940, there was a demand by stockmen and cotton growers for large acreages of land that could be supplied water by pumping. During these years, the Pima Agency received requests for leases of reservation lands to be improved by development of pumped water. Plaintiffs contend that the Pima Agency, in violation of its trust obligations, discouraged prospective lessees by requiring impossible conditions, by delaying decisions on lease applications for unreasonable times, and by withholding approval of development of the reservation through leases.

The Pima Agency's control and management of leases of reservation land carried with it the trust obligation to manage the program in a reasonable and good faith manner for plaintiffs' benefit. In this part of their claims, plaintiffs distinguish the factual situation present in the Indian Claims Commission's decision in *Ak-Chin*[52] from the facts in these dockets. In *Ak-Chin*, the Commission dealt with a similar problem: the United States had drilled wells that partially irrigated the reservation; and plaintiffs contended that the United States had a duty to develop the ground water resources. The Commission ruled, however, there was no special obligation to develop the ground water, and the affirmative acts of drilling wells for irrigation were gratuitous. The wells were adequate to provide sufficient water to sustain the land, and affirmative acts alone did

52. *American Indians Residing on the Maricopa-Ak-Chin Reservation v. United States,* 31 Ind.Cl. Comm. 384 (1973).

not constitute a duty to maximize the Indians' economic potential under the fair and honorable dealings standard. As to the *Ak-Chin* claim that the United States undertook an affirmative duty to develop water resources, the Commission found that the United States owed no duty to plaintiff to develop the water resources on the reservation to a greater extent than it already had.[53] As to the *Ak-Chin* claim that the United States had prohibited the Indians from developing their land, the Commission found that plaintiff had introduced no evidence to indicate its desire to develop its reservation independently of defendant.[54]

In these dockets, plaintiffs assert the deficiency in proof in *Ak-Chin* has been corrected by defendant's conceding it prohibited drilling on the reservation. Here, the claim is that the United States prohibited the development of plaintiffs' ground water resources by its refusal to permit drilling of irrigation wells, and by delaying its decisions and withholding approval of lease applications. Plaintiffs rely upon the *Navajo Tribe* case [55] for the proposition that, while the United States may have no obligation to go out and find lessees for the reservation, it would be a breach of trust if the Pima Agency unreasonably withheld approval of leases that would have been beneficial to plaintiffs, or if its refusal to approve leases when the applicant sought to drill wells unreasonably prohibited development of the reservation. Plaintiffs cite the statement in *Navajo Tribe:*

> There may be a distinction between omission and commission on the government's part. That is, while the government has no fiduciary duty to actively endeavor to lease plaintiff's property, it would violate its fiduciary duty if it unreasonable refused to approve leases. But this latter has not been charged.[56]

Although the difference between "omission" and "commission," or the distinction between a duty to develop and duty not to prohibit development, may involve ephemeral and semantic concepts, plaintiffs are entitled to rely on this statement. It is unnecessary to resolve these legal niceties. If the affirmative acts of the Pima Agency in its refusal to permit drilling on the reservation, or in delaying or withholding approval of requests to lease, were unreasonable or if such actions were inconsistent with what the United States was required to do in the circumstances, defendant would be liable for breach of its duties to plaintiffs.

Plaintiffs' contention that the Pima Agency discouraged prospective lessees by requiring impossible conditions refers (1) to the alleged requirement to purchase Tempe Drain water from SRVWUA, and (2) to the requirement in the 1946–51 program that water for new tracts that had not previously been leased be obtained from off-reservation sources. These matters have been discussed in detail in Nos. 1 and 2 above. Plaintiffs were in error on the facts as to the purchases from the SRVWUA.

The requirement for an off-reservation source of water, and its corollary prohibition against drilling on the reservation, were reasonable and in good faith. At the time the May 26, 1945, decision to go forward with new leases was made, the legal implications of drilling on additional tracts under the Buckeye-Arlington settlement were uncertain, and there was good reason to believe that such drilling would be a violation of prior rights to water in the Tempe Drain that were held by other lessees. The Pima Agency refusal to approve leases where a lessee wanted to drill wells

53. *Id.* at 393.

54. *Id.* at 394.

55. *Navajo Tribe v. United States,* 610 F.2d 766, 222 Ct.Cl. 158 (1979).

56. *Navajo Tribe,* 610 F.2d at 768. The Court of Claims did not rule upon the distinction between omission and commission in a failure to lease. This *Navajo Tribe* decision was in a proceeding for an accounting, and was concerned with the liability of a trustee to account for lease proceeds. The case was remanded for a determination of whether defendant's contemporaneous leasing of BLM lands involved a conflict of interest and an exploitation of obligations owed the Navajos.

on new tracts on the reservation was neither an imposition of an impossible condition, nor a breach of defendant's duty not to unreasonably withhold approval of leases.

Plaintiffs cite three transactions as proof of their contention that the Pima Agency delayed decision for an unreasonable time on lease applications of third parties. Review of plaintiffs' evidence establishes that any delay in leasing reservation land in those situations was reasonable and in good faith.

In July 1938, and on December 26, 1939, I.F. Collier, requested leases, and on December 19, 1939, Carl Eckholm requested a lease of reservation lands. These requests were considered during the period the Buckeye/Arlington litigation settlement was under consideration. In addition, the current lessees of the Broadacres Ranch had complained about acceptance of any proposal by Collier to drill wells on the reservation that could interfere with their prior rights to water in the Tempe Drain.

The initial Collier lease was made on May 6, 1941. In the circumstances, the 2-year delay was reasonable. On July 14, 1938, the Director of Irrigation had been advised that no lease be granted to I.F. Collier until the Buckeye/Arlington litigation was settled, and until scientific data was compiled that could establish whether the effects of pumping water at the locations proposed would interfere with the Indians' water rights leased to others. In the 1941 lease to I.F. Collier, the Pima Agency avoided these obstacles and started development on this tract by requiring the lessee to obtain off-reservation irrigation water.

In his application, Carl Eckholm proposed to drill two irrigation wells during 1941 that would be operated either by natural gas or by electricity. Electricity was preferred. The Pima Agency on January 18, 1940, responded to both the Collier and the Eckholm applications with the same form letter. The letter included this information: "This office has decided to withhold advertising any of the Reservation lands for improvement leases until the electrical power situation regarding the Parker power for this Reservation has been more definitely decided." Mr. Eckholm responded on January 24, 1940, that he was anxious to get a lease at the earliest possible date and that he "would equip the first well with diesel engine or natural gas."

Plaintiffs argue that the willingness of Mr. Eckholm to use a source of energy other than electricity should have been considered, that a lease should have been made for the tract, and that the Pima Agency's refusal to enter a lease at that time was unreasonable. The record is noteworthy for its scarcity of evidence relative to the electrical power situation, and of its impact on the reservation's lease program. The significance of the Pima Agency statement concerning the electrical power situation regarding the Parker power is unclear. There is no basis for making a determination of whether it was reasonable or unreasonable to delay entering leases on this basis. From the evidence presented by plaintiffs, it is not shown that the Pima Agency unreasonably delayed a lease for the tract involved.

The January 18, 1940, letters to Mr. Eckholm and to Mr. Collier, indicate, contrary to plaintiffs' contention about a delay, that the Pima Agency was trying to move as quickly as possible to make reservation land available for leases. The letter included this statement: "We will continue the work on preparing the land ownership schedules in order that we may be in a position to advertise this land for lease on short notice."

The other instance of alleged delay cited by plaintiffs involves an application by Arthur E. Price on May 10, 1943. A lease to Mr. Price (1946–56) was not granted until 3 years later, February 20, 1946. Plaintiffs' argument that there was delay in this instance is absurd. The land Mr. Price proposed to lease in 1943 was held by the War Department and was included in the survey area for use as an airfield.

Prior to World War II, the Pima Agency was preparing to make certain reservation lands available for lease in a form similar

to the Collier lease. The Pima Agency withheld advertising, however, because of investigations by the War Department for airfields in that area. In a letter dated May 13, 1943, the Pima Agency superintendent advised the Commissioner of Indian Affairs that a lease could not be granted to Mr. Price. The letter stated:

The War Department is at the present time making extensive surveys (running contours, etc., in Sections 13, 14, 23, and 24, all in T 2 S, R 4 E, G & SRM, Arizona, in anticipation of locating airfield at this location). The War Department's local engineering office is unable to give us a release of the areas in Sections 1, 2, 3, 4, 5, 8, 9, 10, 11, 12, that they have had under investigation for airfield purposes; and since the land Mr. Price is requesting to lease is in this area, the local War Department office has advised that their Washington Office be contacted for this information (sections as listed above).

This letter is to ascertain the attitude of the Office regarding Office policies for making improvement leases in this area; and if favorable, then will the Office contact the War Department to ascertain if they are still considering the use of this land for war purposes. If not, we then may proceed with leasing the land.

Plaintiffs cite one additional transaction in which the Pima Agency allegedly withheld approval of a lease. This transaction involved a request in late 1947 from R.W. Hanna concerning the possibility of leasing desert pasture lands. The lands involved were adjacent to the tract on which leases already had been made to Mr. Hanna in March 1947. Plaintiffs' evidence is one document dated December 3, 1947, from the land clerk of the Pima Agency to R.W. Hanna. The land clerk denied the request in a letter that stated: "The policy of the Indian Office is that no pasture land shall be leased to Whites." Plaintiffs offer no other evidence concerning this policy or this transaction.

In the absence of a showing that the Pima Agency policy on December 3, 1947, was unreasonable, there is no basis for a finding that this transaction involves a breach of fiduciary duties. It is observed, however, that at that time the Pima Agency was attempting to make leases that would provide improvements for irrigated agriculture. Presumably, the Pima Agency was not pursuing leases for land that was not susceptible of that kind of development. Further, the agency had a policy of not leasing more lands for development than the Indians could care for. Pasture lands could be taken care of, and used, by the Indians.

On the basis of the foregoing, it is determined that plaintiffs have not established that the Pima Agency unreasonably discouraged, delayed or withheld the approval of leases. Accordingly, plaintiffs have not established that there has been a breach of fiduciary obligations as to those claims.

(6) Failure to Protect Ground Water Resources and Plaintiffs' Irrigated Agriculture.

Plaintiffs contend the United States is obligated to protect the ground water resources of the reservation, and plaintiffs' irrigated agriculture, under the fair and honorable dealings standard. Plaintiffs allege this obligation has been breached and the United States is liable because off-reservation pumping has lowered the water table under the reservation and depleted the ground water available for irrigation. Lower ground water levels, in part, plaintiffs argue, were caused by the Pima Agency's prohibition against drilling on the reservation and the lease requirement for an off-reservation source of water.

Liability under the fair and honorable dealings standard requires, first, a showing that a special relationship exists with these tribes which created a duty to protect ground water resources under the reservation needed for plaintiffs' system of irrigated agriculture. Before the advent of white settlement, these Pima-Maricopa tribes irrigated their fields with surface waters from the Gila River. Water pumped from wells then was unknown. After creation of the

reservation and white settlement of the area, the tribes had neither the resources nor the technology to undertake irrigation by pumped water.

Docket 236 C[57] concerned liability for upstream diversions of surface water. The court after a review of the tribes' history of self-sufficiency from irrigated agriculture decided that the actions taken by the United States in establishing plaintiffs' reservation in 1859, and in enlarging it thereafter, together with repeated recognition of the need to preserve or restore the water supply utilized by plaintiffs in maintaining a self-sufficient status, established the existence of a special relationship between the plaintiffs and the United States concerning the protection of their lands and the water supply utilized on those lands. As a result, the court concluded that the United States under the standard of fair and honorable dealings was required to end the loss of water plaintiffs had suffered from diversion by whites upstream, or, to provide an equivalent supply.[58]

In its consideration of actions needed to comport with fair and honorable dealings and restore an equivalent source of water for irrigation so as to enable the tribes to again become self-sufficient, the court noted that construction of facilities to control the Gila River flow had the advantage of, in effect, creating new water for irrigation and that by developing a ground water pumping system, still more water could be made available. As an alternative to legal proceedings to compel the end of upstream diversions, construction of flow control facilities, commencing in 1905 with the San Tan Ditch project, permitted upstream diversions of water to continue and at the same time for reasons of public policy permitted continued settlement of the upstream Gila River Valley. The court concluded that, after 1905, the United States had done all it was required to do, under its special relationship with the Pimas and

Maricopas to restore an equivalent source of water for irrigation.

Prior to any significant diversions upstream, often using the full flow available, the tribes were able to cultivate only some 7,000 to 8,000 acres per year. Under the fair and honorable dealings clause, the court found, the United States had no obligation to do anything more than to restore the plaintiffs to that pre-diversion standard *i.e.*, enough water to cultivate the acreage they had been cultivating with success before settlers began significant diversions of water.

In Docket 236 C, plaintiffs argued that they were entitled to sufficient water each year to irrigate all the practicably irrigable acres on their reservation. This request was denied. The court held that, for monetary compensation on account of pre-August 1946 injuries under the Indian Claims Commission Act, plaintiffs were not entitled to damages for the failure of the defendant to supply them with all the water necessary to irrigate all the practicably irrigable acres of their reservation. This was because the tribes were unable to use more water than would be used to cultivate 7,000–8,000 acres during the period the United States had failed to do what it was required to do to comport with a standard of fair and honorable dealings. The Indian Claims Commission Act, in allowing monetary damages for pre–1946 wrongs does not call for compensation based on theoretical maximum rights the Indians were wholly unable to utilize.[59] Docket 236 C was remanded for determination of the amount of plaintiffs' recovery for failure of the United States, during the period 1872–1904, to do what it was required to do in the circumstances under the fair and honorable dealings clause.

The Court of Claims in Docket 236 C determined that the United States under the fair and honorable dealings standard had a duty to protect plaintiffs' existing

**57.** *Gila River Pima-Maricopa Indian Community v. United States,* 684 F.2d 852, 231 Ct.Cl. 193 (1982).

**58.** *Id.* at 863.

**59.** *Gila River Pima-Maricopa Indian Community,* 684 F.2d at 865.

supply of surface water from upstream diversions. In these dockets, it must be determined whether the United States also under that standard had a duty to protect plaintiffs' ground water resources. And, further, whether such a duty would include protection of such resources from depletion by pumping both on and off the reservation that lowered generally the water table in the central Arizona basin.

The reasons that establish the existence of the special relationship and obligation to protect plaintiffs' water supply from upstream diversions also operate with respect to the protection of plaintiffs' ground water, insofar as such water is required to provide an alternative source of water for irrigation. When the United States planned and proceeded with technology to control the flow of the Gila River—the San Tan Ditch and the SCIP—the decisions were based, in part, on preservation of the existing settlements along the Gila River and on the continuation of the public policy in favor of settlements. Throughout this period, there was recognition that the projects would be supplemented by development of ground water pumping to provide additional water for irrigation.

In legislation that provided a settlement of the water rights claims of the Ak-Chin community, Congress considered the depletion of ground water on that reservation. The Act of July 28, 1978, states: "it is likely that the United States would be held liable for its failure to provide water and for allowing ground water beneath the reservation to be mined." [60]

The *Winters* doctrine, as it has been developed in cases that involved injunctive or affirmative relief other than money damages, includes an obligation to preserve all water sources within the reservation, including ground water, when one of the

purposes for creating the reservation was to protect irrigation agriculture. [61] When the Federal Government withdraws land from the public domain and reserves it for a federal purpose, such as an Indian reservation, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation. Intent to reserve available water is inferred if the previously unappropriated waters are necessary to accomplish the purpose for which the reservation was created.

The *Winters* doctrine, however, only reserves the amount of water necessary to fulfill the purpose of the reservation. [62] Indian treaty rights to a natural resource that once was exclusively exploited by the Indians secures so much as, but no more than, is necessary to provide the Indians with a moderate living. [63]

In its consideration of Docket 236 C, the Court of Claims did not decide whether plaintiffs fall under the full *Winters* doctrine. It noted that where the doctrine had been applied, the type of case primarily was concerned with future water use, not monetary damages for pre-August 1946 injuries under the Indian Claims Commission Act. The court also observed that there could be legal significance to whether their reservation may have been established to preserve plaintiffs' agricultural status, not to change their habits from nomadic to pastoral. Finally, the court noted that even if the *Winters* doctrine applied fully, its damages award would not be different. The amount of water the Indians could have beneficially used under the *Winters* doctrine was the same amount the United States was obligated to compensate under the fair and honorable dealings standard. [64]

Ground water under the Gila River reservation impliedly was reserved for the Indi-

---

**60.** Pub.L. No. 95–328, 92 Stat. 409.

**61.** *Winters v. United States,* 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908); *Arizona v. California,* 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963); *Capparet v. United States,* 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976).

**62.** *Capparet,* 426 U.S. at 141, 96 S.Ct. at 2070–71.

**63.** *Washington v. Fishing Vessel Assn.,* 443 U.S. 658, 686, 99 S.Ct. 3055, 3074–75, 61 L.Ed.2d 823 (1979).

**64.** *Gila River Pima-Maricopa Indian Community,* 684 F.2d at 865.

ans. The special relationship that triggers the fair and honorable dealings standard obligates the United States to protect the ground water to the extent that it is needed as a supplement to surface water supplies to maintain a self-sufficient status from irrigated agriculture. This special relationship, however, did not create a right in plaintiffs to have the United States obligated to protect and preserve for them all of the ground water under the reservation.

To show liability for breach of fair and honorable dealings, plaintiffs must show that the Pima Agency failed to do what it was required to do in the circumstances. Plaintiffs' right to protection of ground water resources extended only to ground water that could have been put to beneficial use. Defendant would have liability only on a showing that the Pima Agency's actions denied plaintiffs' water for irrigation that otherwise could have been put to beneficial use.

Plaintiffs argue that the prohibition against drilling wells on the reservation was unreasonable because it benefited non-Indian farmers outside the reservation. Plaintiffs complain that the United States did nothing to stop non-Indians from drilling wells outside the reservation, which could have interfered with water reaching the reservation. Plaintiffs cite no evidence as to how much ground water was taken from under the reservation by off-reservation pumping.

Plaintiffs contend that the United States should be found liable for the loss of water caused by off-reservation pumping regardless of the extent of the loss. Plaintiffs' evidence is not a hard core showing of fact of loss. Rather, plaintiffs seek to prove a loss of ground water under a theory of common sense; pumping nearby the reservation could not help but take water from under the reservation. Plaintiffs proceed on the basis that the quantity of lost water is not a liability issue.

Defendant contends the prohibition against drilling and the requirement for an off-reservation source of water did not constitute any waste of plaintiffs' water assets. Defendant would argue that, even if the United States had a duty to protect all of plaintiffs' ground water, it did not breach that duty.

Defendant's expert[65] in an elaborate analysis, computed the amount of water level decline on the reservation from 1859 to 1964, then compared that amount with the amount of water he claims was pumped from wells on the reservation. The expert concluded that the amount of water mined from under the reservation approximately was equal to the amount of water pumped from wells on the reservation. Defendant concludes, therefore, there was no waste and no liability.

Plaintiffs challenge the conclusions in the expert's report as not supported by the data available. Between 1923 and 1942 there was practically no change in the depth to ground water levels on the reservation. One of plaintiffs' challenges involves the data as to the 1942–47 period. For the period 1942–47, defendant's expert calculated ground water levels declined an average 3.8 feet, with 210,000 acre feet of water being mined from under the reservation. He also calculated that the decline from 1947–64 was about 60 feet, with about 3,500,000 acre feet of water mined from under the reservation. This amounted to an average yearly total of 200,000 acre feet being mined.

Plaintiffs point out, accurately, that the report of defendant's expert stated that there are no data to determine the depth to the reservation ground water table in 1947 and that the closest periods for which data were available were 1942 and 1952.

Plaintiffs contend it would be pure speculation to find that between 1942 and 1947

---

**65.** Mr. Leonard Halpenny, engineer and geologist, was a recognized expert in ground water resources and uses. He had extensive professional experience with the U.S. Geological Survey from 1939–43, and from 1946–55. After 1957, he was a consultant to Portugal, for work in Angola, Africa, and to cities and private water companies for development of water supplies in Arizona, Utah, New Mexico, California, Mexico and Canada.

the reservation ground water levels declined an average of 3.8 feet or to find that between 1942 and 1947, a total of 210,000 acre feet of ground water was mined on the reservation. It is unquestioned that between 1942 and 1952 the ground water under the reservation declined.

Plaintiffs note that if there is any credible evidence showing the decline between 1942 and 1947, it is not presently in the record in these cases. Neither is there any evidence (other than reports obtained by defendant especially for these cases) in the record of the quantity of water lost to the reservation between 1942 and 1947 by that unknown decline. There is no credible evidence to show that absent off-reservation mining of ground water, reservation pumping has at any time exceeded what would have been the net recharge to reservation ground water.

Plaintiffs also show miscalculations in the computations of defendant's expert concerning the amount of water pumped from wells on the reservation. The expert took the amount of acres irrigated by water from wells on both Indian SCIP and non-SCIP lands. He assumed that all of these lands were irrigated with water from wells on the reservation. Much of the non-SCIP land, however, was irrigated with water from wells located off the reservation. This was the basis of the 1946 leasing policy.

Defendant's claim that the amount of water mined from under the reservation is equal to the amount of water pumped from wells on the reservation is not established. There is no persuasive evidence of the amount of water pumped from on-reservation wells as compared with the amount of water mined. Defendant's analysis of the data available in the record is not adequate to show there was no waste of reservation ground water.

The following factors bear upon consideration of fair and honorable dealings in this claim. Ground water under plaintiffs' reservation is a valuable resource that the United States, both as a trustee and under the standard of fair and honorable deal-

ings, has a duty to protect. After plaintiffs' water supply was depleted by upstream diversions, there was general recognition by United States officials that ground water was available for irrigation purposes. Extraction was expensive and pumped water was not considered a primary method for providing water to reestablish plaintiffs' supplies. Experimental wells were installed in 1904, and both the San Tan Ditch project and the SCIP utilized pumped water for part of the supplies. The leasing program that commenced in 1918 also included installation of wells as part of the development of non-SCIP parts of the reservation. Finally, in the period around World War II when increased pumping began to be reflected by lowered water tables, Pima Agency representatives were concerned that increased development of wells just outside the reservation boundary would lower ground water levels. The facts establish that the authorization to the Pima Agency on May 26, 1945, to go forward with a leasing program based upon water from sources off the reservation was made in recognition of the duty to protect ground water resources. In the light of all relevant considerations, in the 1945 decision and in the subsequent leases made during the 1946–51 period, the United States did all it was required to do in the circumstances.

Plaintiffs have not shown that they have lost ground water, during the period relevant to the Act, that the Pima Agency was obligated to protect. Plaintiffs have wells for ground water pumping on that part of their reservation included in the SCIP. Plaintiffs also have wells installed on non-SCIP lands in the reservation that were leased during the 1918–46 period. There has been no showing that the off-reservation pumping deprived plaintiffs of irrigation water they could beneficially have used at that time.

It is true that aggressive mining in the central Arizona basin has lowered the water table substantially in all areas, including plaintiffs' reservation. The concept of mining ground water as an expendable resource did not develop until World War II, and it remains highly controversial. Delib-

erately extracting ground water at a rate that exceeds the annual rate of recharge, if continued for sufficient time, ultimately may result in such dire conditions that any type of agriculture will be precluded in the central Arizona basin. That contingency, however, had not arrived when the 1945 decision was made. When, and if, it occurs, there may be occasion to deliberate United States obligations to Indians on the reservation as against its obligations to other affected ground water users. Those questions, however, are not within the scope of fair and honorable dealings under the Act.

## CONCLUSION

For the foregoing reasons, plaintiffs have not established defendant breached any trust obligations that arise from the Pima Agency's control and management of leases of reservation lands during the period 1918–51. Nor have plaintiffs established that there has been a failure to deal with plaintiffs fairly and honorably in the control and management of those leases. Because no liability is found, it is not necessary to deal with the question whether the claims in these dockets are individual or tribal, in whole or in part. The complaints in Dockets 236 F and 236 I will be dismissed. No costs.